**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 92-5192

RICKY DON BLACKMON,

Petitioner-Appellant,

versus

WAYNE SCOTT, Director,
Texas Department of Criminal
Justice, Institutional Division,

Respondent-Appellee.

Appeal from the United States District Court
for the Eastern District of Texas

(May 26, 1994)

Before POLITZ, Chief Judge, JOLLY and EMILIO M. GARZA, Circuit
Judges.

POLITZ, Chief Judge:

Ricky Don Blackmon appeals an adverse summary judgment
rejecting his 28 U.S.C. § 2254 petition for habeas corpus relief.
For the reasons assigned we vacate the judgment and remand for
further proceedings consistent herewith.

Background

In March 1987 Ricky Don Blackmon and his girlfriend Donna Mae
Rogers were unemployed, impoverished, and living outside Dallas,

Texas.  Rogers told Blackmon she knew people in Joaquin, Texas who would be good targets for a robbery.  She drove Blackmon there, telling him she would lure an old acquaintance, Carl J. Rinkle, to the Rinkle house where she would knock him unconscious and steal his cash.  Blackmon was to wait outside the house.  Rogers entered the residence but returned to tell Blackmon she could not knock Rinkle out.  After Rogers went back inside Blackmon looked through a bedroom window and saw a nearly naked Rogers with a completely naked Rinkle on the bed.  Blackmon contends that when he saw this he became so enraged that it caused him to break into the house and murder Rinkle.  Blackmon took a large sword, which he had made from a sawmill blade, out of the trunk of his car and knocked on the front door.  Rinkle answered the door unarmed.  Blackmon killed Rinkle, brutally slashing his body.  Blackmon and Rogers then looted the residence of various items, including approximately $700 in cash.

Several weeks later Blackmon was arrested just before midnight.  He gave a taped statement and signed a written confession at 5:30 a.m. the next day.[1]  Blackmon was charged in a two-count indictment with the capital murder of Rinkle during the course of committing and attempting to commit the offenses of burglary of a habitation and robbery.  Rogers gave a taped statement and signed confession.  Copies of both were provided to Blackmon prior to his trial.  The state did not call Rogers as a witness until the sentencing phase.

---

[1]Blackmon's statement and confession were admitted at trial.

The trial began on October 19, 1987.  On October 23 the state notified Blackmon for the first time of its intent to use, during the sentencing phase, evidence of an uncharged Oklahoma double homicide.  The jury returned a verdict of guilty.  During the sentencing phase the state presented extensive evidence of uncharged crimes allegedly committed by Blackmon in Oklahoma.  Blackmon had no prior criminal convictions.  The state's witnesses included Terry Sittig, who had pleaded guilty to the Oklahoma murders, Raymond Smith and Gary Keith Hall.

Sittig was brought to Shelby County from an Oklahoma prison just prior to testifying.  Sittig had pleaded guilty to the Oklahoma murders; he was to testify that Blackmon assisted in the crime.  Sittig asked to speak with Blackmon.  Blackmon's counsel simultaneously sought an interview.  The state objected, arguing that defense counsel should not be allowed to speak with Sittig until after Sittig had testified.  The trial court ruled that Blackmon's counsel was entitled to read Sittig's written statement and was to be given five minutes to ask Sittig whether the statement was true.  The trial court instructed that a prosecutor was to be present during defense counsel's interview.  That interview was conducted in a police car in the presence of a prosecutor and several law enforcement officers.  Following the interview, Blackmon's counsel objected on the basis of surprise and asked for a one-week continuance to investigate the uncharged allegations.  This objection was overruled and the continuance was denied.

On October 29, 1987 the state announced that two of Blackmon's former cellmates in the Shelby County jail, Smith and Hall, would be called as witnesses. Warrants were issued to have them brought back to Shelby County. According to Blackmon, once Smith and Hall arrived at the Shelby County jail they were instructed to remain hidden from Blackmon in order to prevent any investigation into the content of their testimony. Smith and Hall faithfully followed those instructions, including crawling on the floor in certain parts of the jail in order to remain out of Blackmon's sight. When counsel for Blackmon made repeated inquiries at the jail in attempts to interview the former cellmates, jail personnel misrepresented that they were not present. It was only on the eve of their testimony that their presence was made known and then only late at night by telephone long after Blackmon's counsel had gone to sleep. According to Smith and then-jailor Phillip Lynch, both Smith and Hall were present in the Shelby County jail several days prior to trial but the state concealed their presence despite repeated inquiries from Blackmon's counsel.

At the conclusion of the punishment phase the jury affirmatively answered the special issues; the trial court assessed punishment of death by lethal injection. Blackmon's conviction and sentence were affirmed on direct appeal,[2] and the United States Supreme Court denied Blackmon's petition for writ of certiorari.[3]

---

[2]**Blackmon v. State**, 775 S.W.2d 649, No. 70001 (Tex.Crim.App. Sept. 13, 1989) (unpublished).

[3]**Blackmon v. Texas**, 496 U.S. 931 (1990).

4

Blackmon unsuccessfully sought habeas relief in state court and then filed the instant habeas petition. The district court granted the state's motion for summary judgment rejecting Blackmon's petition but granted a certificate of probable cause. Blackmon timely appealed.

## Analysis

After addressing the merits of two of Blackmon's 31 federal habeas claims, the district court concluded, "[a]fter reviewing the entire record, the Court finds that all of Blackmon's remaining claims for relief are without merit." Blackmon asserts that because the district court addressed only two of his 31 claims, its order did not provide the specificity necessary to provide a meaningful opportunity for review by this court, citing **Flowers v. Blackburn**.[4] The district court expressly stated, however, that it had reviewed the pleadings and entire record to determine that Blackmon had not raised any genuine issue of material fact and that the state was entitled to judgment as a matter of law. **Flowers** is distinct in that respect. In this setting, the fact that the district court specifically addressed only two out of 31 claims does not, alone, constitute reversible error.

Blackmon next contends that the findings of fact adopted by the state court were drafted by an assistant district attorney and provided to the court *ex parte* without affording Blackmon notice or an opportunity to respond. Blackmon asserts that in granting

---

[4]759 F.2d 1194 (5th Cir. 1985), cert. denied, 475 U.S. 1132 (1986).

5

summary judgment the district court improperly accorded the state court's factual findings a presumption of correctness.  Blackmon did not raise this claim in the trial court and it will not be considered for the first time on appeal.[5]

Blackmon complains that only the first two special issues regarding deliberateness and future dangerousness were submitted to the jury and that the third special issue regarding provocation was not.[6]  In order to raise the issue of provocation, "it is necessary that there be evidence of the deceased's conduct just prior to his death; also, that evidence must be sufficient to be considered provocation."[7]  Here, Blackmon was a party to the criminal episode in which Rogers lured Rinkle into his home to steal his money.  During his interrogation Sheriff Paul Ross asked:  "Did you ever tell her to go back and get in bed with Carl or did she do this on her own?"  Blackmon answered:  "I told her she could put the make

---

[5]**United States v. Cates**, 952 F.2d 149 (5th Cir.), cert. denied, 112 S.Ct. 2319 (1992).

[6]The special issues provided under Tex. Code Crim. Proc. Ann. art. 37.071(b) are:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

[7]**Hernandez v. State**, 643 S.W.2d 397, 401 (Tex.Crim.App. 1982), cert. denied, 462 U.S. 1144 (1983).

on him like she was but I didn't actually tell her she had to."
Rinkle was unarmed when he answered the door and could not defend
himself.  As Blackmon participated in the creation of the criminal
episode, initiated the violence, and brutally assaulted and killed
an unarmed individual, the fact that he saw Rogers perform as
instructed is patently insufficient to establish provocation.[8]

Blackmon further claims that the Texas capital sentencing
scheme is unconstitutional as applied to his case because the jury
was not allowed to give full consideration to the mitigating
evidence that he murdered Rinkle in a jealous rage.  Blackmon's
claim in unavailing.  The jury was able to consider any mitigating
effect that evidence might have under the future dangerousness
issue.  The jury could have concluded that Blackmon killed in an
episodic jealous rage and that he would therefore be unlikely to
pose a danger in the future.[9]  We perceive no constitutional
violation.

Blackmon raises a **Brady**[10] claim by asserting that the state
improperly withheld Rogers' statements and testimony until the
sentencing phase so as to avoid a jury instruction on voluntary

---

[8]**McBride v. State**, 862 S.W.2d 600, 611 (Tex.Crim.App. 1993),
petition for cert. filed (Dec. 21, 1993) (Statements by the victim
were "insufficient to constitute `provocation' where appellant
creates the criminal episode as he did here, initiates the
violence, and assaults several unarmed individuals with a deadly
weapon.").

[9]See, e.g., **Marquez v. Collins**, 11 F.3d 1241 (5th Cir. 1994)
(finding that the jury could have considered defendant's jealous
rage due to wife's infidelity in his murder of his niece under
future dangerousness special issue).

[10]**Brady v. Maryland**, 373 U.S. 83 (1963).

7

manslaughter.  In order to succeed on a **Brady** claim Blackmon must show:  (1) the prosecution suppressed evidence; (2) the evidence was favorable; and (3) the evidence was "material either to guilt or punishment."[11]  Evidence is material only if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.  The state is not required to furnish a defendant with exculpatory evidence that is fully available to the defendant or that could be obtained through reasonable diligence.[12]  The exculpatory evidence to which Blackmon refers is Rogers' testimony and statements concerning Blackmon's alleged jealous nature and sudden passion killing of Rinkle.  Any jealous nature Blackmon might possess would be information known to Blackmon; thus there was no need for the state to provide such evidence.  Furthermore, the prosecutor is under no duty to make a complete and detailed accounting to defense counsel of all investigatory work done.[13]  No **Brady** violation occurred.

Blackmon contends that Smith, Hall, and Sittig each obtained promises of assistance in exchange for their testimony implicating Blackmon in the uncharged double homicide in Oklahoma, but that they each falsely testified that they had not been promised assistance and that the prosecutor used the false testimony in his

---

[11]**Id.** at 87.

[12]See **May v. Collins**, 904 F.2d 228 (5th Cir. 1990), cert. denied, 498 U.S. 1055 (1991).

[13]**United States v. Agurs**, 427 U.S. 97 (1976); **Mattheson v. King**, 751 F.2d 1432 (5th Cir. 1985), cert. dismissed, 475 U.S. 1138 (1986).

8

closing argument.  Blackmon asserts a due process violation in the state's suppression of impeachment evidence[14] and its use of the perjured testimony.[15]  Blackmon additionally asserts that because the prosecutor failed to respond to the allegation that a deal was made with Sittig in contravention of the lower court's order, the record in inconclusive and an evidentiary hearing is essential.

To obtain a reversal based upon the prosecutor's use of perjured testimony, Blackmon must show that (1) the statements were actually false; (2) the state knew they were false; and (3) the statements were material, i.e., a highly significant factor reasonably likely to have affected the jury's verdict.[16]  To obtain reversal based upon the prosecutor's suppression of impeachment evidence, Blackmon must likewise show that the evidence was material, irrespective of good faith or bad faith by the prosecution.[17]  From the record we are able to determine that Smith, despite receiving a letter from the prosecutor which was sent to the Parole Board in exchange for his testimony, denied that any such agreement existed.[18]  During cross-examination Hall indicated

---

[14]**Giglio v. United States**, 405 U.S. 150 (1972); **Brady**, 373 U.S. 83 (1963).

[15]**Napue v. Illinois**, 360 U.S. 264 (1959).

[16]**United States v. Blackburn**, 9 F.3d 353 (5th Cir. 1993).

[17]**Giglio**, 405 U.S. at 153.

[18]Q.  And, of course, you're not getting anything --
      any consideration for coming up here and
      testifying, you're just doing it because
      you're a good buy [sic]?
   A. No, sir.  I just -- I just came tell [sic]
      what I heard, that's all.

9

an agreement whereby the prosecutor would help him before the Parole Board if he testified truthfully,[19] and the prosecutor acknowledged the agreement during closing argument. It is unclear from the record whether Sittig had an agreement with the prosecutor which was not revealed to Blackmon or the jury. A letter was sent by the prosecutor to the Oklahoma Parole Board acknowledging Sittig's cooperation with Blackmon's prosecution. As the prosecutor never responded to these allegations, Sittig's affidavit indicates there was an agreement, and the state vigorously denies that one existed, there appears to be a genuine issue of material fact. The record does not reflect whether Smith had a deal which was never revealed and, as noted, is unclear with respect to Sittig. A determination of materiality cannot be made at this point. Because Smith, Hall, and Sittig were the only sources of evidence to link Blackmon directly to the Oklahoma murders, we remand for an evidentiary hearing for the express purpose of clarifying the conflicting evidence and the making of all relevant

---

[19]Q.  Did you ever tell anybody before last Friday
     anything about this?
   A.  No, sir.
   Q.  When you were bench warranted up here, you
     thought it was the right thing to do, is that
     right?
   A.  Yes, sir.
   Q.  Just to get your conscience clear?
   A.  I guess so.
   Q.  Not getting anything out of this are you?
   A.  No, sir.
   Q.  No consideration, nobody is going to write
     anything for you to the Parole Board?
   A.  Well, I was told that if I told the truth that
     it would help me out on parole.

fact-findings.[20]

Next Blackmon alleges a due process violation because of the state's hiding of witnesses Smith and Hall and his lack of access to Sittig, and he further alleges that these claims cannot be resolved without an evidentiary hearing.[21] A state violates a capital defendant's right to due process under the fourteenth amendment when it uses evidence at the sentencing phase of the trial which the defendant does not have a meaningful opportunity to rebut.[22] This violation becomes more pronounced when the state makes an affirmative effort to conceal witnesses to prevent a timely investigation and fair presentation of testimony.[23] A *prima facie* showing of a due process violation, however, does not entitle

_____

[20]Although the district court found that Sittig gave his statement of his own free will, in light of the contradictory evidence we find that such a determination cannot be made without an evidentiary hearing. The state habeas court's finding of fact in this regard is: "The record is devoid of <u>any</u> evidence that there were undisclosed agreements on the part of the State to provide lenient treatment for any of the State's witnesses in exchange for their testimony." (Findings of Fact ¶ 21) (emphasis added). This is clearly unsupported by the record which contains conflicting evidence. This conflict must be resolved. <u>See</u> **Townsend v. Sain**, 372 U.S. 293 (1963).

[21]Blackmon also interjects that due to the lack of adequate notice, the state had a duty under **Brady** to produce the prior testimonies of James Sherfield (the surviving eyewitness to the Oklahoma attack) and Officer Madison, and Sittig's plea colloquy. As Blackmon shows no legal basis for this argument, we do not accept same.

[22]**Gardner v. Florida**, 430 U.S. 349 (1977) (plurality).

[23]<u>See</u>, <u>e.g.</u>, **Freeman v. Georgia**, 599 F.2d 65 (5th Cir. 1979), <u>cert</u>. <u>denied</u>, 444 U.S. 1013 (1980); **Lockett v. Blackburn**, 571 F.2d 309 (5th Cir.), <u>cert</u>. <u>denied</u>, 439 U.S. 873 (1978).

11

a defendant to reversal absent a showing of prejudice.[24]

Although the state court found that no unfair surprise occurred with respect to introduction of the Oklahoma murders, Blackmon raises an additional objection. He complains that he was denied adequate access to Sittig, contending that the circumstances surrounding the brief interview in a police car did not provide a fair opportunity for preparation of a proper defense. Blackmon similarly complains of inadequate access to Smith and Hall who allegedly were hidden in the jail. Without appropriate access to Smith, Hall, and Sittig, Blackmon could not prepare for and impeach them with any arrangements which might have been made in exchange for their testimony. No state court findings were made with respect to this aspect of Blackmon's claim. Remand is necessary for an evidentiary hearing in order to evaluate more properly Blackmon's due process claim as it relates to inadequate access, and to determine whether prejudice existed.

With respect to unfair surprise, Blackmon points to two pieces of evidence which could not be rebutted because of the minimal notice that the Oklahoma double homicide evidence would be introduced: Sittig's testimony that only he and Blackmon were involved in the double homicide and Officer Madison's testimony that a car fitting the description of Blackmon's, with Texas license plates, was present at the scene of the Oklahoma murders. The state court found that it could not determine what Blackmon's counsel might have done differently had more time been given to

---

[24]**United States v. Henao**, 652 F.2d 591 (5th Cir. Unit B 1981).

12

prepare. Blackmon asserts that with more time he could have shown that Sittig's testimony at Blackmon's trial conflicted with statements he made during his plea colloquy. With respect to Officer Madison's testimony, Blackmon contends that he could have shown that Officer Madison testified falsely regarding the car with Texas license places. Without examining the transcript of the Oklahoma trial we cannot know if that is the case. We must likewise remand for an evidentiary hearing and appropriate findings thereon.

Finally, Blackmon asserts that the district court erred in rejecting his sixth amendment **Massiah**[25] claim without holding an evidentiary hearing. Blackmon's former cellmates, Smith and Hall, testified that Blackmon made incriminating statements concerning the two Oklahoma murders. Blackmon contends that the information contained in these statements was originally supplied to the informants by Shelby County jail officials, the informants were promised assistance in their cases in exchange for help in obtaining information from Blackmon, and the informants subsequently used that information to taunt Blackmon into confessing to the crime. The district court reviewed the evidence submitted by Blackmon without a hearing and determined that the record supports the conclusion that no sixth amendment violation occurred.

"It is the duty of the district court, and ours as well, to review *de novo* the legal conclusions reached on the basis of the

---

[25]**Massiah v. United States**, 377 U.S. 201 (1964).

13

facts."[26]  Because no state court findings were entered relating to this claim,[27] we conclude that the district court's denial of relief without benefit of an evidentiary hearing violated **Townsend v. Sain**.[28]  Although the state correctly points out that the "Sixth Amendment is not violated whenever -- by luck or happenstance -- the State obtains incriminating statements from the accused after the right to counsel has attached,"[29] it is not clear from the record that the information was obtained from Blackmon by "luck or happenstance."  To the contrary, the affidavit of Raymond Smith states that "After that, Keith and I kept our ears open around Ricky.  But he didn't say much at all.  <u>Finally, Keith got him to talking</u>. . . ."  In addition, when Hall testified regarding the information obtained from Blackmon, he stated, "He [Blackmon] said that -- well, <u>I asked him -- we asked him</u> why did he kill them . . . ."

The state argues that the evidence fails to show that Smith and Hall were ever instructed to interrogate Blackmon.  Even if that is true, it is unavailing.  Our decision in **United States v.**

---

[26]**May v. Collins**, 955 F.2d 299, 315 (5th Cir.), <u>cert</u>. <u>denied</u>, 112 S.Ct. 1925 (1992).

[27]The district court noted that the state "trial court did not make any express findings of fact or conclusions of law on this issue but did conclude that the `applicant has failed to demonstate that his conviction was unlawfully obtained.'"

[28]372 U.S. 293, 313-14 (1963) ("There cannot even be the semblance of a full and fair hearing unless the state court actually reached and decided the issues of fact tendered by the defendant.").

[29]**Maine v. Moulton**, 474 U.S. 159, 176 (1985).

**Johnson**[30] is instructive on this point.  In **Johnson** we explained that even when officers instruct an agent <u>not</u> to ask a defendant questions about his case, if the agent does more than just listen to elicit incriminating remarks, a sixth amendment violation occurs.[31]  Thus our inquiry must focus on what Smith and Hall did to obtain the incriminating statements.  It is not clear <u>how</u> Blackmon was convinced to talk or whether Smith and Hall, acting as agents of the state, deliberately attempted to elicit incriminating remarks.[32]  The affidavits and testimony present a genuine issue of material fact; the granting of summary judgment was inappropriate.  In attempting to answer the sixth amendment issue before us, it is immediately apparent that the credibility determinations required cannot be made.  An evidentiary hearing is required.

We VACATE the judgment of the district court and REMAND for further proceedings consistent herewith.

---

[30]954 F.2d 1015 (5th Cir. 1992).

[31]**Id.** at 1019-20.

[32]**Kuhlmann v. Wilson**, 477 U.S. 436 (1986).