**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 96-50443

CHARLES RECTOR,

Petitioner-Appellant,

versus

GARY L. JOHNSON, DIRECTOR, TEXAS DEPARTMENT
OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,

Respondent-Appellee.

Appeal from the United States District Court
for the Western District of Texas

August 18, 1997

Before JOLLY, JONES, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

In 1982, Charles Rector was convicted for the murder of Carolyn Kay Davis.  For that, Rector was sentenced to die.  Rector's conviction and sentence were affirmed by the Texas Court of Criminal Appeals, and the United States Supreme Court denied certiorari.  Rector then sought and was denied state habeas relief.  In a fifty-four page order, a federal magistrate judge denied Rector federal habeas relief; the district court adopted the magistrate's report and recommendation over Rector's objections.  The district court also refused to grant Rector a Certificate of Probable Cause (CPC).  Rector now seeks a Certificate of Appealability (COA) or CPC from us.  Construing Rector's appeal as a request for a CPC, we decline to issue a CPC and affirm Rector's conviction and sentence of death.

**BACKGROUND**

The Abduction

Mark Arnold and Carolyn Kay Davis shared apartment number 204 of the La Paz apartments located in Austin, Texas. On the evening of October 17, 1981, Arnold and Davis went grocery shopping; they took separate cars because Davis had to stop off at a bank on the way home from the grocery store. That night, Davis had on size 6 Calvin Klein blue jeans, a long-sleeved shirt, a gold chain with a cross, and a high school ring. At about 8:45 p.m., Arnold (who was following Davis) saw Davis turn down a street headed to their La Paz apartment. Arnold would never see Davis alive again.

Arnold returned to the apartment at approximately 9:15 p.m., only to find the door unlocked, the lights on, and a bag of groceries overturned on the couch. Arnold searched for Davis. In the parking lot, he found Davis's car locked, with the interior lights on and a sack of groceries still inside. Arnold then returned to the apartment, went into the bedroom, and found the window and curtains open and the screen smashed through. Arnold found a Schrade knife that did not belong to him or Davis on the floor underneath the window. Two of Arnold's rifles were also missing, and the closet and bedroom had been ransacked. Arnold testified that his gym bag, which contained a strain gauge used in engineering research, was missing. At that point, Arnold called police and continued looking for Davis.

Davis's abduction did not occur silently. Two witnesses who lived next door to Davis testified that on the evening of October 17, they were in the living room of their apartment when at approximately 9 p.m., they heard a woman's short, startled scream. They then heard the shuffle of feet and a door slam. The witnesses went outside their apartment and saw nothing unusual. Ten minutes after returning to their apartment, Arnold came to their apartment in search of Davis.

The neighbor in the other adjoining apartment also testified that at about 9 p.m. on October 17, he was sitting in his apartment when he heard voices coming down the hallway. One person asked, "Where is it?" and another person responded, "It's 204." The witness heard the voices pass his door and window. The witness then looked out the window and saw three black men standing

in front of Davis's apartment. One of three men was wearing overalls, but the witness could not see their faces. The witness watched the three men for approximately thirty seconds and then returned to his chair in his apartment. The witness testified that shortly after returning to his chair, he heard a slam, a brief scream, and a sound like someone diving in a pool. The witness then looked out the window again, but saw nothing. The witness came out of his apartment about thirty minutes later, when he heard a policeman's walkie-talkie.

The Investigation Leading up to Rector's Arrest

A fingerprint technician from the Austin Police Department arrived at Davis's apartment at approximately 9:35 p.m. to process the fingerprints that may have been in the apartment. Investigating police also came to the apartment. At about 11 p.m., the investigating police left the scene. The fingerprint technician, however, was still in the process of packing up his gear when he heard (the door to the apartment was open) footsteps coming up the landing toward Davis's apartment. He looked out the door, saw two black men walking quickly, and radioed for officers to look for the two men. Davis's stepfather, who was also in the apartment at that time, gave chase.

Another resident of the apartment complex testified that at about 11:15 p.m., she saw Rector jogging through the apartment complex. Rector asked, "Did you see two other black dudes around here?" The witness testified that she answered Rector's question in the negative.

Officer William Matthews of the Austin Police Department testified that he responded to a call at 11:30 p.m. on October 17. Officer Matthews saw the fingerprint technician and Davis's stepfather standing on the corner pointing east. Officer Matthews proceeded in that direction and came upon a green 1969 Buick Skylark stopped diagonally in the street with the trunk open. The car reversed, quickly accelerated forward, ran a stop sign, and then ran a flashing red light. Officer Matthews stopped the car. As he approached the car, Matthews saw in the trunk two rifles, a vinyl bag, and clothing. Rector was the driver and sole occupant of the vehicle.

When Rector exited the car, Officer Matthews saw that he (Rector) was wearing a tight pair of designer blue jeans and no shirt. Rector told Officer Matthews that he had bought the items found

in the trunk of his car from a black male in a white Ford pickup. Officer Matthews thereafter arrested Rector and brought him to the city jail. After arriving at the jail, Officer Matthews searched Rector and found a silver colored watch, one plain gold chain, a gold chain with a green stone, one gold chain with a gold star and a diamond in the center, one gold ring with a cross, and one woman's 1978 Anderson High School graduation ring with the initials "CKD" inside. Officer Matthews then exchanged Rector's jeans for jail clothes; Rector was not wearing any underwear.

The blue jeans taken from Rector were size 6, with a Calvin Klein brand name on them. An expert witness testified that the crotch area of the jeans tested positive for the presence of seminal stains. Arnold testified that the jeans taken from Rector were identical to those Davis was wearing when he last saw her. Arnold also identified a number of items found either on Rector's person or in his (Rector's) car that linked him to the burglary: the watch found in the blue jeans belonged to Arnold (it was in the dresser drawer of his apartment); the necklaces taken from Rector's car were similar to those Davis was wearing; the rings found in Rector's car belonged to Davis; the two rifles and strain gauge recovered from Rector's car were the items missing from the apartment; a blue-striped blouse found among the clothing in Rector's car was the same blouse Davis was wearing when Arnold last saw her alive; and a number of other items found in Rector's car, including a jar of pennies and miscellaneous clothing.

The jury was also told that Rector owned the 1969 Buick and that a number of items found inside the car (separate from the items found in the trunk) linked him to the burglary and abduction and murder of Davis. An Austin used car dealer testified that he sold Rector a 1969 green Buick Skylark on October 15, 1981 (approximately two days before the crime). The witness identified a document taken from a billfold found in the car as the receipt he gave Rector at the time of the sale. On the right front seat of the car, the police found bib overalls, and in a pocket was a copy of a traffic citation issued to Rector on October 15, 1981. An Austin police officer confirmed that he issued a traffic citation to Rector on that date. In addition, a leather sheath with a snap-over flap bearing the name "Schrade" was with the overalls; the Schrade sheath fit the knife found in Davis's apartment.

4

The police also found a Rohm .22 caliber, six-shot revolver on the right front floorboard of the car; the cylinder held two live rounds, two spent shells, and two empty chambers.

Recovery of Davis's Body

On the morning of October 18, 1981, the nude body of Davis was discovered in the Colorado River just off of Redbud Island in Austin. Officials removed the body from the river at approximately 3 p.m. that day. The Medical Examiner's autopsy revealed that Davis had suffered a gunshot wound to the head (behind the right ear), and he recovered a .22 caliber bullet from Davis's brain. The Medical Examiner testified that the barrel of the gun which fired the shot was at least six inches away from Davis's head. In addition, the Medical Examiner concluded that Davis did not die from the gunshot wound because such a wound causes death within thirty minutes to an hour and because there were indications that Davis drowned. Based on the presence of water in her lungs, a dilated heart, bleeding in the middle ears, and an abundance of frothy pink fluid exuding from Davis's nostrils and mouth, the Medical Examiner stated that drowning intervened as the cause of Davis's death. He put the time of death at "most probably . . . around 11 p.m."[1]

A firearms expert also attempted to link up the .22 caliber bullet recovered from Davis's brain and the .22 caliber gun found in Rector's car. The expert testified that the bullet found in Davis's head was fired from a weapon that had eight lands and grooves inclined to the right. According to the expert, the gun recovered from Rector's car matched that description. However, the expert was

---

[1]The Medical Examiner calculated the time of death based on Davis's body temperature. Davis was thin, so that her body would be expected to cool to the surrounding temperature in about 18-19 hours. When she was found, Davis's body temperature was 80 degrees, and the water temperature where she was found was 78 degrees.

In addition, the Medical Examiner did not state conclusively that Davis died at 11 p.m. Because of the inexact science (at least in 1981-1982) of determining times of death, the Medical Examiner stated that Davis could have died any time between 9 p.m. and the early morning hours of October 18, 1981.

unable to positively link the bullet taken from Davis's brain to Rector's gun because the bullet was mutilated.

## PROCEDURAL HISTORY

Rector was charged with the capital crime of intentional murder in the course of committing and attempting to commit the offenses of burglary, kidnaping, and robbery. Rector was convicted in 1982 and sentenced to death. The Texas Court of Criminal Appeals affirmed Rector's conviction and sentence. See Rector v. State, 738 S.W.2d 235 (Tex. Crim. App. 1986). The United States Supreme Court thereafter declined to issue a writ of certiorari. See Rector v. Texas, 484 U.S. 872 (1987) (order denying certiorari review).

Rector then sought state habeas relief. After an evidentiary hearing, the state trial court made findings of fact and conclusions of law denying Rector relief. The Court of Criminal Appeals affirmed the denial of relief on the ground that the trial court's findings and conclusions of law were fully supported in the record.

On May 19, 1988, Rector filed a petition for habeas corpus in the United States District Court for the Western District of Texas. While the case was pending, Rector filed a second state habeas application in the state trial court. Without conducting an evidentiary hearing, the trial court denied relief. Rector once again applied for habeas relief in the Court of Criminal Appeals. That court, recognizing the pendency of the federal habeas petition, subsequently dismissed Rector's habeas application under Texas's abstention doctrine. On April 3, 1990, the federal district court dismissed Rector's petition without prejudice for failure to exhaust state remedies.

Rector was back in state court a third time, filing a habeas petition with the trial court on December 8, 1992. The trial court, however, did not act on the petition, which was submitted to the Court of Criminal Appeals by operation of article 11.07 of the Texas Code of Criminal Procedure. On February 29, 1993, the Court of Criminal Appeals denied habeas relief, concluding that Rector's claims were meritless.

6

On November 12, 1993, Rector sought to "reinstate and/or reactivate" his federal habeas petition. Rector, however, moved to withdraw his petition on June 10, 1994, and that motion was granted. On June 22, 1994, Rector re-filed in federal court his petition for habeas corpus. In a 54-page report filed on March 29, 1996, a magistrate judge denied Rector relief; the district court, over Rector's objections, adopted the magistrate judge's findings of fact and conclusions of law and entered final judgment on May 14, 1996. The district court also denied Rector's request for a CPC. Rector filed a timely notice of appeal on June 10, 1996.

## DISCUSSION

Rector makes three arguments in this appeal. First, Rector argues that the Government violated its Brady obligations by suppressing evidence of an alleged alibi witness. Second, he claims that the district court committed reversible error when it concluded that Rector did not have the right to have all exhibits from the State habeas hearing forwarded for inclusion in the federal habeas case for possible in camera inspection under Rule 6(a) of the Federal Habeas Rules of Procedure. And third, Rector contends that he was denied effective assistance of counsel because his attorney did not properly investigate the time-of-death evidence offered by the State, which if investigated, would, in Rector's view, establish his innocence. None of these claims has merit.

## I.    THE APPLICABILITY OF THE AEDPA

Before we discuss the applicable standard of review and Rector's claims, we first address the (now) thorny problem of whether the newly enacted Antiterrorism and Effective Death Penalty Act (AEDPA), Pub.L. 104-132, 110 Stat. 1214 (1996) applies to Rector's appeal. Prior to June 23, 1997, the answer to this question was settled in this Circuit: the AEDPA did in fact apply to cases pending on the day the President signed the bill into law (i.e., April 24, 1996). See Drinkard v. Johnson, 97 F.3d 751 (5th Cir. 1996), cert. denied, 117 S. Ct. ____ (1997). As such, because Rector's federal habeas petition was pending as of April 24, 1996, the AEDPA would have applied to this appeal.

On June 23, 1997—while this appeal was pending in our court—the Supreme Court handed down <u>Lindh v. Murphy</u>, ---- S. Ct. ---- (1997), in which the Court held that (in noncapital cases at least), the AEDPA does not apply to cases pending on the Act's effective date. It is unclear whether or not the reasoning in <u>Lindh</u> effectively overrules <u>Drinkard</u> (a capital case) and compels us to apply pre-AEDPA standards to Rector's appeal.[2] We need not decide this question, however, because its resolution is not necessary to the disposition of Rector's appeal, for whether his claims are analyzed under AEDPA or pre-AEDPA standards, Rector is not entitled to federal habeas relief. <u>See, e.g.</u>, <u>Livingston v. Johnson</u>, 107 F.3d 297, 302 (5th Cir. 1997). Accordingly, we apply our pre-AEDPA case law to this appeal and construe Rector's notice of appeal as a request for a CPC.[3]

## II. STANDARD OF REVIEW

The requirements for issuing a CPC are well established.[4] Rector cannot appeal the district court's denial of federal habeas relief unless he obtains a CPC from the district court or this court. 28 U.S.C. § 2253, <u>amended by</u> AEDPA § 102. Because the district court denied Rector's request for a CPC, Rector's right to appeal turns on whether we find that he has made a "substantial showing of the denial of a federal right." <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 (1983). In particular, Rector must "demonstrate that the issues are debatable among jurists of reason; that a court could resolve

---

[2]<u>See</u> <u>Green v. Johnson</u>, ---- F.3d ----, ----- (5th Cir. 1997) ("Although we have held previously that the standards of review set forth in the AEDPA apply to all habeas petitions that were pending on April 24, 1996 . . . <u>see</u> <u>Drinkard</u> . . , we must now conclude otherwise in light of <u>Lindh v. Murphy</u> . . . ."). We also note that the magistrate judge as well as the district court denied Rector federal habeas relief on the basis of pre-AEDPA standards.

[3]The State has recognized this point, has not insisted on applying the AEDPA to Rector's federal habeas claims, and has analyzed Rector's contentions under both AEDPA and pre-AEDPA precedents. Red Brief, at 14. Moreover, we have (on at least three occasions) recognized that the State of Texas does not yet qualify for the expedited AEDPA habeas procedures governing capital cases (AEDPA, § 107(a)). <u>See</u> <u>Green v. Johnson</u>, ---- F.3d at ----; <u>Carter v. Johnson</u>, ---- F.3d -----, ---- (5th Cir. 1997); <u>Mata v. Johnson</u>, 99 F.3d 1261, 1267 (5th Cir. 1996), <u>vacated in part on other grounds</u>, 105 F.3d 209 (5th Cir. 1997). We have no occasion to disturb that conclusion here.

[4]Of course, the Supreme Court's decision in <u>Lindh</u> leaves untouched our view that the standards for issuing a CPC are the same as those for issuing the post-AEDPA COA. <u>See</u> <u>Drinkard</u>, 97 F.3d at 755-56.

the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further." Id. at 893 n.4 (internal citations and quotation marks omitted). Rector need not, however, demonstrate that he would ultimately prevail on the merits. See Drew v. Collins, 5 F.3d 93, 95 (5th Cir.), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 555 (1994). And "'[a]lthough in a capital case the court may properly consider the nature of the penalty in deciding whether to grant CPC, this alone does not suffice to justify issuing a certificate.'" Turner v. Johnson, ---- F.3d ----, ---- (5th Cir. 1997) (quoting Jacobs v. Scott, 31 F.3d 1319, 1323 (5th Cir.), cert. denied, ---- U.S. ----, 115 S.Ct. 711, 130 L.Ed.2d 618 (1995)).

## III. THE ALLEGED BRADY VIOLATION

Underlying Rector's Brady claim is his view that he is innocent of Davis's murder. As such, Rector paints a different picture of the events on the night of October 17, 1981—a view which boils down to the suggestion that the State arrested, prosecuted, convicted, and sentenced to die the wrong man. Urging, as Rector does, his factual innocence of a crime which carries the (ultimate) sentence of death causes us to proceed with great caution. Rector argues that he didn't kill Davis because at the time Davis allegedly died (i.e., 11 p.m.), Rector was supposedly seen at a local convenience store located approximately eighteen minutes from the murder scene. Of course, a jury of his peers disagreed, so we must now (almost sixteen years after his conviction) determine whether the State withheld from the defense information that could have exonerated Rector.

Rector claims that the State violated its obligations under Brady v. Maryland, 373 U.S. 83 (1963) by suppressing material, exculpatory information. In particular, Rector argues that a statement given to police by Carolyn Stillwell, a convenience store clerk, proves that Rector could not have murdered Davis because, from his vantage point, Stillwell places him in a different part of Austin at the time the murder allegedly took place.[5]

---

[5]Rector also claims that the State suppressed evidence suggesting that Arnold, Davis's boyfriend, did not positively identify the blue jeans Rector was wearing as those belonging to Davis. Arnold testified that the jeans Rector was wearing, to best of his knowledge, were the ones Davis was wearing on the night of the murder. The state habeas court so found and that factual finding is entitled to a presumption of correctness. 28 U.S.C. § 2254(d) (now § 2254(e)(1)). We have

We first lay out the <u>Brady</u> requirements, and then present the alleged exculpatory evidence, the rejection by state and federal courts of Rector's <u>Brady</u> claim, and conclude with Rector's (rehashed) <u>Brady</u> claim in this appeal. We ultimately hold, consistent with every other court that has reviewed Rector's alleged <u>Brady</u> violation, that there was no <u>Brady</u> violation under the facts of this case.

A.    The Brady <u>Requirements</u>

Although the State is obligated to disclose evidence to the defense, the State need not disgorge <u>every</u> piece of evidence in its possession. Rather, under <u>Brady</u>, the State has an affirmative duty to disclose to the defense evidence that is favorable to the accused and material to guilt. <u>See</u> <u>United States v. Bagley</u>, 473 U.S. 667, 674 (1985). Such evidence includes impeachment evidence. <u>Id.</u> at 676; <u>see also</u> <u>Wilson v. Whitley</u>, 28 F.3d 433, 435 (5th Cir. 1994), <u>cert. denied</u>, 115 S. Ct. 754 (1995). The State's good or bad faith in withholding favorable evidence is irrelevant. <u>See</u> <u>United States v. Agurs</u>, 427 U.S. 97, 110 (1976).

We have held that to state a <u>Brady</u> claim, a defendant must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable, (3) the evidence was material to either guilt or punishment, <u>and</u> (4) discovery of the allegedly favorable evidence was not the result of a lack of due diligence. <u>See</u> <u>United States v. Mmahat</u>, 106 F.3d 89, 94 (5th Cir. 1997); <u>Blackmon v. Scott</u>, 22 F.3d 560, 564 (5th Cir.), <u>cert. denied</u>, 115 S. Ct. 671 (1994). The State has no obligation to point the defense toward potentially exculpatory evidence when that evidence is either in the possession of the defendant or can be discovered by exercising due diligence. <u>See</u> <u>United States v. Mmahat</u>, 106 F.3d at 94; <u>Brown v. Cain</u>, 104 F.3d 744, 750 (5th Cir.), <u>cert. denied</u>, 117 S.Ct. 1489, 137 L.Ed.2d 699 (1997). Nor is the State obligated under <u>Brady</u> to disclose evidence that is available from other sources. <u>See</u> <u>Blackmon v. Scott</u>, 22 F.3d at 560.

B.    The Alleged Brady <u>Material—The Stillwell Statement</u>

---

reviewed  the record and perceive no justification for questioning the state court's finding.

10

The record reflects that at some point during the week following Davis's murder, Officer Allen Anderson was informed that on the evening of the murder (October 17, 1981), the suspects (Rector, Anthony Miller, and Howard Ray Simon) were "looking for a convenience store to rob." Anderson visited all of the convenience stores in the University of Texas area (twenty or so stores) to determine whether anyone had seen the suspects. After speaking with Stillwell, a clerk at a convenience store at Airport Boulevard and 51st Street, Anderson wrote the following report on October 24, 1981:

> At the U-Tote-M store at E. 51st and Airport , Carolyn Stillwell (Candy) . . . who was positive that Charles Rector and Anthony Miller were in her store Saturday night 10/17/81. She stated that she was sure and especially of Miller because he looked a lot [sic] like a black/male who hasselled [sic] her previously and she looked at him real good to make sure it was not that same person. She stated that Rector and Miller came in and stood around the back of the store. They got four quarters for a dollar bill and played the video game . . . for awhile. She stated a couple of other black/males and a white dude came in at the same time but that they left in a pickup truck with two Latins in the back of the truck. Ms. Stillwell stated that Rector and Miller stayed appx 30-45 minutes and then left and that she did not see what they left in. She stated that they were in before closing (12 midnight), and left just before closing. She stated they came in about 11:00 p.m.

Stillwell did not testify at Rector's trial. However, the State called her as a rebuttal witness in the trial of Rector's co-defendant, Anthony Miller.[6] We find it helpful, indeed illuminating, to recount Stillwell's testimony at Miller's trial because it sheds valuable light on the alleged exculpatory nature of the information possessed by Stillwell.

At Miller's trial, Stillwell identified Miller and Rector as two of the three men she saw in the U-Tote-M store after 11 p.m. on the night of Davis's murder. As to the time at which she noticed Rector and Miller, Stillwell testified that "[i]t was around closing. Around—It was after 11:00. Around 11:30, 12 o'clock, because we had started the cleanup procedure for closing at midnight." Stillwell also testified that after the three men entered the store, one went back outside and stood by the front door. According to Stillwell, Rector and Miller were in the store for approximately 15-20 minutes. After they left, "[t]he gentleman that had been standing outside got in a dark colored pickup

---

[6]At his trial, Miller claimed that he had not even been with Rector on the night of October 17, 1981. Miller was acquitted.

11

with some other people in back of it and left. And the two that were in the store had got in the car they pulled up in and left. And I [Stillwell] did not see which direction they went. The people in the pickup went towards Lamar, up Airport, which would be northwest."

On cross examination, Miller's counsel (counsel for Rector in this case) impeached Stillwell regarding inconsistencies between her testimony and Officer Anderson's account of her statement. Stillwell did not recall telling Officer Anderson that Rector and Miller had stayed in the store for thirty to forty-five minutes. In addition, Stillwell stated that the two men had not played the video game that night, although she subsequently testified that she could not remember whether or not they had in fact played the game. Stillwell claimed that Rector and Miller came into the store at 11:30 p.m. (around closing) and left about twenty to thirty minutes before closing (midnight).

### C.    Rector's Claims

Rector claims that he has satisfied the Brady requirements because the Stillwell statement proves that he could not have murdered Davis at the time and place claimed by the State. On habeas review,[7] this same claim was rejected by Texas state courts as well as the federal district court.

### 1.    State Habeas Review of Rector's Brady Claim

In its March 1988 rejection of Rector's Brady claim, the state habeas court (the trial judge who presided over Rector's criminal prosecution) concluded that Stillwell's statement was neither relevant nor material to any issue or defense raised in Rector's trial. The state court relied on the written confession of Rector's co-defendant, Howard Ray Simon (who subsequently escaped from prison and was shot and killed during a robbery attempt in Louisiana), which implicated Rector as the trigger man;[8] Rector's failure to explain adequately to the police his possession of jewelry belonging to Davis as well as possession of a .22 caliber pistol with two spent rounds; Rector's failure

---

[7]In his direct appeal, the Texas Court of Criminal Appeals also rejected the same Brady claims Rector made in his state and federal habeas petitions. Rector v. State, 738 S.W.2d at 244-46.

[8]The state court reproduced and relied on Simon's confession, which, in excruciating and morbid detail, described the events of the evening of October 17, 1981. That confession, which was never presented to the jury, unambiguously portrayed Rector as the trigger man in Davis's murder.

12

to file a more specific Brady request; and the lack of corroboration between Rector's statement of events to police and Stillwell's statement to Officer Anderson.

## 2. Federal Habeas Review (The Magistrate's Report) of Rector's Brady Claim

The Magistrate also rejected Rector's Brady claim, concluding that the Stillwell statement was not suppressed, did not contain evidence favorable to Rector, was not material, and could have been obtained with the exercise of due diligence (i.e., Rector's failure to discover the Stillwell testimony was the result of a lack of due diligence on his part).

### D. Analysis

Although we conclude that Rector has not met any one of the four Brady requirements, we nonetheless analyze each of the Brady prongs because Rector has been sentenced to die for a crime he alleges he did not commit.

#### 1. The Prosecution did not Suppress the Stillwell Statement

We have held that "[e]vidence is not 'suppressed' if the defendant either knew, or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." West v. Johnson, 92 F.3d 1385, 1399 (5th Cir. 1996). "The prosecutor," we have concluded, "is under no duty to make a complete and detailed accounting to defense counsel of all investigatory work done." Blackmon, 22 F.3d at 565.

The Magistrate judge concluded that Rector, better than anyone else, knew his whereabouts on the night of Davis's murder, and therefore his failure to discover the information possessed by Stillwell was the result of a lack of diligence on his part. We agree.

Rector continuously reminds us that this is a circumstantial evidence case that is fact sensitive. That the case against Rector is built on circumstantial evidence does not diminish the correctness of the Magistrate judge's findings. Moreover, given Rector's consistent claim of factual innocence, we find it highly unlikely that from the very beginning of this prosecution, Rector would not have provided defense counsel a minute-by-minute account of his whereabouts on the night of the murder. Rector had an investigator ready to follow up any leads Rector may have provided in the way of an

alibi. And we have canvassed the record and have found no indication that at any point after Davis's murder and Rector's trial that Stillwell was contacted by defense counsel and/or that Stillwell was unavailable for questioning. Under these circumstances, we conclude that the State did not suppress allegedly exculpatory evidence because that evidence was (readily) available to defense counsel.

Rector's contention that he could not have told his attorneys where he was the night of the murder because he really had no idea of his whereabouts is simply implausible. The record showed that Rector had lived in Austin at least seven months and that Rector's own statements to police officers (e.g., that he could give someone a ride "up the street") demonstrates to us that Rector was fully capable of understanding and describing his whereabouts on the night of October 17, 1981.

### 2. The Stillwell Statement is not Exculpatory

The Texas Court of Criminal Appeals, the state habeas court, and the Magistrate judge all concluded that the Stillwell statement was not exculpatory. We have reviewed Rector's arguments as well as the record and see no reason to reach a different conclusion here.

Rector contends that the Stillwell statement is exculpatory because it in conjunction with medical examiner Bayardo's testimony that Davis died "most probably . . . around 11 p.m." suggests that Rector could not have possibly raped and murdered Davis. In particular, Rector asserts that if Stillwell saw Rector (and Miller) at approximately 11 p.m., he could not have killed Davis because there was testimony from Rector's medical expert that death from drowning occurs in five to ten minutes. We cannot agree with Rector's version of the facts.

The fundamental flaw in Rector's argument is that he assumes that Dr. Bayardo said that Davis <u>in fact</u> died at 11 p.m. Of course, a cursory reading of the testimony reveals that Rector's construction is just plain incorrect. Dr. Bayardo's estimated time of death was in the form of a probability determination, and not a conclusive statement as to Davis's actual time of death. Indeed, Dr. Bayardo repeatedly stated that there is no precise scientific method for pinpointing the exact time of death; such determinations, according to Dr. Bayardo, are only rough estimates. As such, Dr.

14

Bayardo testified that in light of this relatively inexact method of calculating death times, Davis could have died as early as 9 p.m. and as late as the early morning hours of October 18, 1981.

Based on the evidence presented, the jury must have necessarily concluded that Davis died between 9 p.m. (the approximate time of her abduction) and 11:15 or 11:35 p.m. As such, Stillwell's statement that she supposedly saw Rector at 11 p.m. or later does not refute the State's theory that Rector murdered Davis. And that is precisely what the state habeas court found:

> The victim was kidnapped from her home shortly after 9:00 p.m., and the defendant was arrested shortly after 11:30 p.m. on the same night, which provided ample opportunity for the defendant to have taken [Davis] to Red Bud Isle, to have raped her and shot her and thrown her in water and left her to drown. Where the defendant was between 11:00 p.m. and his arrest at 11:35 or 11:40 p.m. would be quite immaterial.

The state court's factual finding that Rector had ample time to commit the murder is entitled to a presumption of correctness. See 28 U.S.C. § 2254(d) (now § 2254(e)(1)). We have reviewed the record and conclude that Rector has not rebutted this presumption.[9]

### 3. The Stillwell Statement is not Material in the Constitutional Sense

The Supreme Court has said that "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Kyles v. Whitley, 115 S. Ct. 1555, 1566 (1995). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985).

---

[9]Rector further claims that Stillwell's statement puts him in the convenience store as early as 10:00 p.m. We find this contention (at the very least) curious because there is not even a hint in Stillwell's statement that she saw Rector at any time before 11 p.m. on the night of the murder. In addition, Rector argues that his own medical expert (who testified at the state habeas hearing) contradicted Dr. Bayardo's estimate of Davis's time of death. However, whether or not Davis died while Rector was in custody is irrelevant to Rector's claim that the State suppressed exculpatory evidence. Finally, Rector contends that Stillwell's statement would have corroborated his explanation to police about his possession of property stolen from Davis's apartment. Not so. The only fact common to both versions is that a pickup truck drove into the parking lot at a convenience store. But (1) the convenience store in Rector's story was at 38th and Guadalupe, while the store in Stillwell's version was at 51st and Airport; (2) Stillwell reported no contact whatsoever with the pickup truck occupants, while Rector claims there was contact; and (3) the pickup truck in Rector's story is white, while in Stillwell's version it was dark. Plainly, Rector's claim of corroboration is simply not persuasive.

15

Furthermore, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." Agurs, 427 U.S. at 109-10. Rather, Rector must show that Stillwell's statement could reasonably be taken to put the whole case in a different light so as to undermine confidence in the verdict. Kyles, 115 S. Ct. at 1566.

We conclude that Stillwell's statement was not material in the constitutional sense and does not undermine our confidence in the jury's verdict of guilt. The following facts support our conclusion: Rector possessed a number of items that were stolen from Davis's apartment; Rector had in his possession clothes and jewelry Davis was wearing when she was abducted; Rector was wearing Davis's size 6 Calvin Klein jeans; Rector possessed a gun that was consistent with the murder weapon; Rector's knife was in Davis's apartment; Rector appeared at Davis's apartment complex shortly after her abduction and murder; and Stillwell's version of events, as we have noted above, contradicts (or at least is inconsistent with) Rector's statement to police about the color of the pickup truck, the location of the convenience store, and the alleged interaction between Rector and the pickup truck occupants.[10]

    4.    Rector's Failure to Obtain Stillwell's Statement is the Result of a Lack of Due Diligence on his Part

For the reasons we stated above in Part III.D.1, we conclude that Rector's failure to exercise due diligence was the sole cause of his failure to obtain the Stillwell evidence before his trial.

## IV.    DISCOVERY UNDER RULE 6 OF THE FEDERAL HABEAS RULES OF PROCEDURE

Rector next argues that the district court reversibly erred in declining to include in the federal habeas record an exhibit that was before the state habeas courts. According to Rector, Court Exhibit No. 1 consisted of the State's prosecution file in this matter; it was admitted into evidence and for in camera inspection during the state habeas corpus hearing on February 5, 1988. The exhibit was subsequently sealed and forwarded to the Texas Court of Criminal Appeals. Exhibit No. 1, however,

---

[10]For these same reasons, we reject Rector's claim that Stillwell's statement suggests that he would not have had enough time to drive from Redbud Isle to Stillwell's convenience store.

16

never made its way into the federal habeas file presented to the magistrate judge. Accordingly, Rector moved the magistrate to inspect in camera Exhibit No. 1 on the ground that the State's files may contain further evidence of suppression of exculpatory information. The motion was denied, so Exhibit No. 1 is not part of the record in this appeal. Rector claims that because this is a death penalty case, excluding from review information which may potentially exculpate Rector would be manifestly unjust. We reject Rector's contentions.

A habeas petitioner may "invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." Habeas Rule 6(a). Rule 6 does not, however, sanction fishing expeditions based on a petitioner's conclusory allegations. See Perillo v. Johnson, 79 F.3d 441, 444 (5t h Cir. 1996). Rather, "[a] federal habeas court must allow discovery and an evidentiary hearing only where a factual dispute, if resolved in the petitioner's favor, would entitle him to relief and the state has not afforded the petitioner a full and fair evidentiary hearing." Ward v. Whitley, 21 F.3d 1355, 1367 (5th Cir. 1994) (emphasis added), cert. denied, 513 U.S. 1192, 115 S.Ct. 1257, 131 L.Ed.2d 137 (1995).

Rector has made no showing that there is a factual dispute that, if resolved in his favor, would entitle him to federal habeas relief. Rector argues that further discovery into the contents of the prosecution's file may produce additional information that would be relevant to his Brady claims. Because Rector has failed to make at least a prima facie showing of what specifically he intends to find and prove, we conclude that Rector's discovery request is nothing more than a desire to engage in a fishing expedition. Nor have we found any authority for the proposition that the mere assertion of a Brady claim necessarily amounts to good cause.

As to Rector's claim that the state habeas records are incomplete without the sealed exhibit, Habeas Rule 5 does not require the Director to file portions of the state court record that are not relevant to Rector's habeas claims. See Dillard v. Blackburn, 780 F.2d 509, 513 (5th Cir. 1986). A federal habeas court has the discretion to determine whether additional state court records are

17

necessary to decide Rector's claims. Id. Here again, Rector has simply failed to explain precisely how the sealed exhibit is necessary to resolve his claims.

## V. THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

We finally turn to Rector ineffective assistance of counsel claim. Rector argues that he received ineffective assistance of counsel because (1) during the guilt phase of the trial, trial counsel failed to adequately investigate and rebut Dr. Bayardo's testimony about Davis's time of death, and (2) during the punishment phase of the trial, counsel failed to present mitigating evidence. None of Rector's claims has merit. The Magistrate judge denied Rector's ineffective assistance claim.

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court laid down the by-now familiar two-part test for resolving ineffective assistance of counsel claims. Under that test, Rector must show that (1) counsel's performance was deficient, and (2) that that deficiency prejudiced the defense such that the result of the trial would have been different. Id. at 687; Lackey v. Johnson, ----- F.3d -----, ----- (5th Cir. 1997). Failure to meet either of the two Strickland prongs would be fatal to Rector's claim. Strickland, 466 U.S. at 700. Rector bears the burden of proving both prongs by a preponderance of the evidence. See Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1992), cert. denied, 113 S. Ct. 2977 (1993). We review de novo the district court's denial of Rector's Strickland claim. See Carter v. Johnson, ----- F.3d -----, ----- (5th Cir. 1997).

To establish deficient performance, Rector must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Strickland, 466 U.S. at 687. "[J]udicial scrutiny of counsel's performance must be highly deferential," and we must strive to eliminate the potential "distorting effect of hindsight." Id. at 689. Accordingly, we must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. To prove prejudice, Rector must demonstrate that the result of the proceedings would have been different or that counsel's performance rendered the result of the proceeding fundamentally unfair or unreliable. Vuong v. Scott, 62 F.3d 673, 685 (5th Cir.), cert. denied, 116 S. Ct. 557 (1995).

18

Rector has neither shown deficient performance nor prejudice. As to Rector's claim that his counsel failed to rebut the time-of-death evidence, the record reveals that Rector's counsel elicited from Dr. Bayardo on cross examination testimony that Davis could have died well after 11 p.m. At the state habeas hearing, nothing said by Rector's own medical expert undermines (or even calls into question) Dr. Bayardo's testimony that his time-of-death estimate was just that, a rough estimate. And given all of the evidence we have recounted above which implicated Rector in the murder of Davis, we cannot conclude that any alleged deficient performance would have made a difference in the outcome of this case.

As to Rector's claim that counsel was ineffective for failing to put on mitigating evidence at the punishment phase of the trial, we note at the outset that such failure is not per se ineffective assistance. See King v. Puckett, 1 F.3d 280, 289 (5th Cir. 1993). If such an omission is based on well informed, strategic decisions, it is "well within the range of practical choices not to be second-guessed." Wilkerson v. Collins. 950 F.2d 1054, 1065 (5th Cir. 1992), cert. denied, 113 S. Ct. 3035 (1993).

Rector admits that trial counsel investigated his background and obtained information that Rector allegedly suffered from child abuse, family instability, a poor educational background, low IQ, gunshot injuries, and that his mother was severely and chronically mentally ill. And counsel for Rector admitted in prior proceedings that they chose not to present such evidence because the jury might very well consider that evidence aggravating, rather than mitigating. Under these facts, Rector has failed to show deficient performance, for as we held in Mann v. Scott, 41 F.3d 968, 984 (5th Cir. 1994), cert. denied, 115 S. Ct. 1977 (1995), a tactical decision not to pursue and present potential mitigating evidence on the grounds that it is double-edged in nature is objectively reasonable, and therefore does not amount to deficient performance. As to prejudice, Rector has presented no specific evidence of any of the potentially mitigating circumstances. Without a specific, affirmative showing of what the missing evidence would have been, we cannot determine whether Rector was

prejudiced by the absence of such evidence at trial.  See Anderson v. Collins, 18 F.3d 1208, 1221 (5th Cir. 1994).

## CONCLUSION

Finding that Rector has failed to make a substantial showing of a denial of a federal right, we decline to issue a CPC and affirm Rector's conviction and sentence of death for the murder of Carolyn Kay Davis.

CPC DENIED; CONVICTION AND SENTENCE AFFIRMED.