**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**August 15, 2003**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**

**For the Fifth Circuit**

No. 02-41416

ANTHONY GRAVES,

Petitioner - Appellant,

VERSUS

JANIE COCKRELL, Director,
Texas Department of Criminal Justice, Institutional Division,

Respondent - Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS, WIENER and EMILIO M. GARZA, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Petitioner Anthony Graves was convicted of capital murder in Texas and sentenced to death. He now seeks a certificate of appealability from the district court's denial of habeas corpus relief. We grant Graves' Application for COA on his claim under Brady v. Maryland, 83 S.Ct. 1194 (1963), that the state failed to disclose to Graves that his co-defendant and key prosecution witness had informed the district attorney that Graves was not involved in the charged crime on the day before he testified to the contrary at Graves' trial. Because Graves has failed to make a substantial showing of a denial of a constitutional right, we deny his application for COA on his remaining claims.

I.

1

Graves was convicted and sentenced to death in November 1994 for the capital offense of murdering one adult and five children in the same criminal transaction. On direct appeal, the Texas Court of Criminal Appeals affirmed the conviction and sentence. Graves did not seek certiorari review in the United States Supreme Court.

In June 1998, Graves filed an application for writ of habeas corpus in state court. After an evidentiary hearing, the court filed findings of fact and conclusions of law recommending the denial of relief. The Court of Criminal Appeals subsequently ordered the case filed and set for oral argument on two claims, and ultimately denied relief. Graves then filed a subsequent application for writ of habeas corpus, which was dismissed as an abuse of the writ. Graves filed a third application for state habeas relief in March 2000, and an amendment on July 2000, which the Court of Criminal Appeals set for submission to decide whether Graves had a statutory or constitutional right to the effective assistance of state habeas counsel. If proven, Graves would be entitled to review of his third application. In January 2002, the Court of Criminal Appeals decided that Graves did not have this right and dismissed the application as an abuse of the writ. Rehearing was denied.

Meanwhile, on Graves' motion, the United States District Court for the Western District of Texas granted a deposition of recanting trial witness Robert Earl Carter, who was set to be executed. Carter was deposed and later executed. Graves timely filed this federal habeas petition in May 2002. The district court denied all relief and denied COA. Graves now seeks a COA from this court.

II.

The Court of Criminal Appeals summarized the relevant facts of the crime in its opinion on direct appeal:

At trial, the State presented the in-court testimony and other statements of [Graves']

2

accomplice, Robert Earl Carter. Carter testified as follows:

A week or two before the instant offense, [Graves] and Carter met and discussed their respective problems with [Bobbie Davis] and her daughter, L.D. (Carter's girlfriend). L.D. had informed Carter that she was filing a paternity suit against him to arrange for the support of their son, [Jason Davis]. Carter feared that the court would order an amount of child support which would ruin his credit record. Also, Carter had continued to date L.D. after marrying Cookie Carter, [Graves] first cousin. Further, Cookie had recently given Carter an ultimatum demanding that he end his relationship with L.D. Similarly, L.D. pressured Carter to end his relationship with Cookie. [Graves], on the other hand, was angry with Bobbie whom [Graves] believed received a promotion that his mother, Doris Curry, should have received due to [Bobbie's] relationship with the unit director at the Brenham State School. [Graves] and Carter agreed that they needed to settle their problems with [Bobbie] and L.D. Carter and [Graves] talked again on the weekend before the offense and decided on a specific date and time to go to [Bobbie's] house in Somerville to have a verbal confrontation with [Bobbie] and L.D. Although several children, including Carter's son, [Jason], sometimes lived in the home, Carter believed the children would be staying in Houston on the chosen date.

On the evening of the instant offense, [Graves] contacted Carter at approximately 11:30 p.m., and asked if they were still planning to go to [Bobbie's] home. Carter answered affirmatively. Around 12:00 or 12:30 a.m., Carter drove his Grand Am to [Graves'] apartment after stopping to buy a five gallon can of gasoline. [Graves] and Carter drove to [Bobbie's] house in Carter's Grand Am. Carter walked to the house alone and rang the doorbell. [Bobbie] answered the door and Carter entered the house. Carter and [Bobbie] discussed Carter's son ([Jason]) for 20 to 25 minutes, then Carter told [Bobbie] he wanted to show her an item which he had to retrieve from the car. Carter walked to the car and told [Graves] [Bobbie] was apparently alone in the house, as he had seen no sign of L.D. or the children.

[Graves] and Carter both entered. Carter brought a .22 revolver and a claw hammer; [Graves] carried a knife. [Graves] began yelling at [Bobbie] and then began to make stabbing motions at her. Carter then saw [Bobbie's] sixteen-year-old daughter, [Nicole Davis] enter the room. Carter chased her into her bedroom and shot his .22 pistol at her several times. Carter then panicked and fled the house.

When Carter reached the car, he took the gasoline can out of the trunk of the car, entered the house and began pouring gasoline. He saw [Bobbie's] body slumped over and covered with blood. As he entered the bedrooms at the back of the house, he found the bodies of five dead children and doused them with gasoline. Carter did not see [Graves] during this time. Carter returned to the car and put the gasoline can in the trunk. He returned to the house to light the gasoline, and ran into [Graves], who

3

was coming out of the front door. Simultaneously, Carter heard a "whoof" as the gasoline ignited: Carter fell to the ground, suffering some burns to his face, neck and hand. [Graves] drove the Grand Am back to his apartment, and then Carter drove himself home.

Carter removed his clothes and placed them in a plastic bag which he hid in the trunk of Cookie's Honda. At around 6:00 a.m., Cookie drove the Honda to the Brenham State School, where she worked with [Bobbie] and Doris Curry, [Graves'] mother. Later, Carter received a telephone call and was told Cookie was very upset and needed to be driven home. Carter left in his Sunbird, because dried blood was visible on the outside of the Grand Am. After reaching the Brenham State School, Carter and Cookie returned home in the Honda. When they arrived, Carter poured gasoline on some tall grass in his yard, lit the gasoline and fell in the burning grass, again burning the previously burned portions of his body. He drove out into the country, burned the bag of clothing and threw away the gun, the hammer, and the knife in different locations. He then cleaned the blood off of the Grand Am with gasoline. Afterwards, Carter and Cookie drove to Somerville to console the victims' family. Carter went to a doctor's appointment later that day for a hernia. The doctor insisted on treating and bandaging the burns. A few days later, Cater drove to Houston and traded the Grand Am and the Sunbird for a new Pontiac Grand Prix. He and Cookie then attended the victims' funeral. Carter was stilled wrapped in bandages. Texas Rangers, who were present at the funeral, observed Carter's burns, visited Carter that afternoon and obtained a statement wherein Carter named [Graves] as the primary perpetrator and only admitted limited involvement in the crime. Carter and [Graves] were both arrested and placed in the Burleson County Jail in cells directly across from each other.

While incarcerated, [Graves] entered the cell where Carter was receiving a haircut and threatened him physically and verbally. [Graves] told Carter to change his story and deny everything when he went before the grand jury. Fearing [Graves] would make good on his threats, Carter told the grand jury that he had fabricated his prior statements, and that neither he nor [Graves] were involved in the murders.

*  *  *

Eliminating all accomplice testimony from consideration, the State presented the testimony from the medical examiner, two representatives of the State Fire Marshall's [sic] office who viewed the crime scene, several Texas Rangers who investigated the case, [Graves'] ex-girlfriend, [Graves'] former supervisor and boss, and four individuals who overheard [Graves] make statements while incarcerated for the instant offense. The State also relied on [Graves'] testimony before the Grand Jury. The evidence presented by the State generally supported Carter's testimony. For example, Texas Ranger Ray Coffman testified that Carter, soon after the first

4

interview, identified five of the six locations of the victims' bodies within the house with more specificity and accuracy that a new article on the murders . . .

[Graves'] former boss, Roy Allen Rueter, testified he gave [Graves] a switchblade knife in the year before the offense. He had assembled the knife from a kit and had also made a knife for himself. Rueter's knife, except for the handle, was identical to [Graves'].

[Graves'] former supervisor and former girlfriend confirmed they had seen the switchblade knife in [Graves'] possession. The supervisor, Thomas Genzer, indicated [Graves] showed him the knife and it was identical to Rueter's, except for the handle. Genzer saw [Graves] with the knife on several occasions and [Graves] was proud of the knife. However, [Graves] testified before the Grand Jury in this case: "No sir, I never owned a knife, period."

Rueter's switchblade knife was admitted as State Exhibit 192. The medical examiner, Dr. Robert Bayardo, compared the knife to the puncture wounds made in two of the victim's skull caps and to the wounds suffered by the victims. He testified the blade matched the incisions, and opined that Rueter's knife, or a knife with a similar blade made the cuts. Texas Ranger Ray Coffman, who had extensive experience with knives, witnessed the autopsy and made his own comparisons between the knife and the skull caps. Coffman agreed with Dr. Bayardo, testifying State's Exhibit 192 fit the incisions, "like a glove" and provided a "perfect fit" to chips in the skull caps caused by glancing blows. [FN 5]

> FN 5. [Graves'] medical expert, Dr. Robert Bux, conceded that he had no quarrel with Dr. Bayardo's findings. However, he testified that several other knives presented by the defense, which had the same general blade dimensions as Rueter's knife, were also "consistent" with the holes in the skull caps. Ranger Coffman then testified that the knives presented by the defense did not fit the holes and chips in the skull caps, as their blades were too thin and flexible. He testified that the knife which created the holes in the skull caps had the precise blade thickness, length, and width of Rueter's knife. Further, he indicated the knife used by the killer, unlike the examples offered by the defense, would need to have a knife guard, such as the guard on State's Exhibit 192, to provide leverage and protect the hand of the stabber as it impacted a hard surface like a skull.

The State also presented the testimony of several individuals who overheard [Graves] make inculpatory statements in the county jail after being incarcerated for the instant offense. [Graves] was speaking to Carter who was jailed in the cell directly across from [Graves]. While delivering food to the jail, John Robertson overheard a conversation between [Graves] and Carter. Robertson heard [Graves] say, "[w]e

5

fucked up big time." Then he heard [Graves] remark that they had taken care of the evidence and it could not be traced to them. [Graves] also insisted they had to protect Cookie at all costs, and suggested Carter might have to go down for all of them because Carter had been burned. Robertson notified the Sheriff of [Graves'] statements that night and gave a written statement several days later.

On the same evening, Ronnie Beal, a former employee of the Burleson County Sheriff's Department, overheard [Graves] say, "[k]eep your damn mouth shut. I done the job for you. Make them make their own damn case." Beal further heard [Graves] say they had to protect Cookie because she could go down for life. Also, Jailer Shawn Eldridge overheard [Graves] tell Carter, "I did it, keep your mouth shut!" Beal explained he and Eldridge attempted to record the conversation between [Graves] and Carter, but by the time a tape recorder was secured, the conversation was over. Beal immediately called the Sheriff and informed him of the conversation and gave a written statement several days later. [FN 6]

> FN 6. The State also presented testimony from John L. Bullard, Jr., an inmate incarcerated at the same time as [Graves], who heard [Graves] ask Carter if he had told them everything. Bullard heard Carter answer, "no," and then saw the two men start communicating in hand signals when someone warned them that the intercom was activated.

Graves v. Texas, No. 72,042, slip op. at 2-8 (Tex.Crim. App. April 23, 1997)(names in brackets added.)

Carter testified at Graves' trial in return for the agreement of the prosecutors that he would not answer any questions regarding his wife's involvement. Since the trial, Carter has recanted his testimony linking Graves to the crimes and in his latest statement asserts that Graves is innocent. Additional facts necessary to the issues will be presented in the sections that follow.

### III.

Graves filed the instant Section 2254 application for habeas relief after the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA). His application is therefore subject to the AEDPA. Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, a petitioner must obtain a COA before appealing the district court's denial of habeas relief. 28 U.S.C.

6

§ 2253(c)(2). "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. . . .'" Miller-El v. Cockrell, 123 S.Ct. 1029, 1039 (2003) (quoting 28 U.S.C. §2253(c)(1)). "The COA statute . . . requires a threshold inquiry into whether the circuit court may entertain an appeal." Id. (quoting Slack v. McDaniel, 529 U.S. 473, 482 (2000); citing Hohn v. United States, 524 U.S. 236, 248 (1998)). A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983) (citation and internal quotation marks omitted). Any doubt regarding whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination. Fuller v. Johnson, 114 F.3d 491, 495 (5th Cir. 1997).

The analysis "requires an overview of the claims in the habeas petition and a general assessment of their merit." Miller-El, 123 S.Ct. at 1039. The court must look to the district court's application of AEDPA to the petitioner's constitutional claims and determine whether the court's resolution was debatable among reasonable jurists. Id. "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." Id. Rather, "'[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" Id. at 1040. (citing Slack, 529 U.S. at 484).

IV.

Graves claims first that he is actually innocent of the crime and that the imposition of the death

penalty against him would be cruel and unusual punishment and violate the due process clause. Graves relies primarily on Carter's post-trial statements maintaining that Graves played no role in the murders. In Herrera v. Collins, 506 U.S. 390, 416 (1993), the Supreme Court held that such a claim does not state an independent, substantive constitutional claim and was not a basis for federal habeas relief. However, it left open whether a truly persuasive actual innocence claim may establish a constitutional violation sufficient to state a claim for habeas relief. Id. at 417. The Fifth Circuit has rejected this possibility and held that claims of actual innocence are not cognizable on federal habeas review. Dowthitt v. Johnson, 230 F.3d 733, 741 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001); Graham v. Johnson, 168 F.3d 762, 788 (5th Cir. 1999); Lucas v. Johnson, 132 F.3d 1069, 1075 (5th Cir. 1998); Jacobs v. Scott, 31 F. 3d 1319, 1324-25 (5th Cir. 1994).

In addition, even if a truly persuasive claim of actual innocence could be a basis for relief, the Supreme Court made clear that federal habeas relief would only be available if there was no state procedure for making such a claim. Herrera, 506 U.S. at 417. Texas habeas law recognizes claims of actual innocence. Ex parte Elizondo, 947 S.W.2d 202, 205 (Tex. Crim. App. 1996) and Graves may still utilize Texas' procedures for executive clemency. Lucas, 132 F.3d at 1075. Graves' state habeas petition was adjudicated on the merits and the state court found Carter's statements to be incredible and unreliable. These findings are presumed correct and Graves has not presented a persuasive claim of actual innocence. 28 U.S.C. § 2254(e)(1); Galvan v. Cockrell, 293 F.3d 760, 764 (5th Cir. 2002) (federal courts defer to the trier of fact in resolving credibility of witnesses.) Graves also argues that Texas' clemency procedures are completely ineffective. However, those procedures are available and have been relied on as an alternative avenue for relief for prisoners like Graves. Lucas, 132 F.3d at 1075; Beets v. Texas Bd. of Pardons & Paroles, 205 F.3d 192, 193 (5th Cir.

8

2000).

The above reasons are sufficient to deny COA on this issue.

V.

Graves argues next that he was deprived of due process and his right to present witnesses on his behalf because the prosecutor prevented Graves from having the benefit of a key witness's testimony when the prosecutor told the district court that a defense witness might be subject to criminal charges. See Webb v. Texas, 93 S.Ct. 351 (1972). The potential trial witness, Yolanda Mathis, testified before the grand jury that Graves was with her the entire night of the killings and could not have been involved in the crime. The defense subpoenaed Mathis to testify at trial. Before she could do so, the state argued, out of the jury's presence, that Mathis was a suspect in the murders and could be subject to indictment. The state asked the court to advise Mathis of her rights prior to her testimony and the court agreed. In preparing Mathis for her testimony, Graves' lawyers told Mathis of the state's position and advised her of her right not to testify and possibly incriminate herself. This frightened Mathis. She left the courthouse in a panic and did not testify.

The defense team did not attempt to force her to testify, did not seek a continuance and did not make any objection or comment on the record regarding the reasons for Mathis' failure to testify or seek to preserve her testimony. Mathis was not actually arrested or charged during the remainder of the trial. The prosecution alluded to Mathis's failure to testify in his closing argument, apparently because the defense had promised her as an alibi witness in their opening statement. At that point, the defense objected that this argument was improper and commented before the jury that Mathis was absent because the district attorney had threatened her. Outside the presence of the jury, Graves' attorneys told the court that Mathis had invoked the 5th Amendment. In their Motion for New Trial,

9

the defense team alleged that the prosecutor's threats improperly prevented Mathis from testifying.

On Graves' first state habeas petition, the Court of Criminal Appeals found that Graves had procedurally defaulted on this claim under Texas law because it was not raised at trial until closing argument. The court found that the record could be read to suggest that the defense tactically waited to raise this issue to deliberately infect the trial with allegations of the prosecution's threats. In the alternative, the court found that the state had a good faith basis for identifying Mathis as a suspect, did not personally threaten Mathis with prosecution and simply sought to protect her rights.

The district court found the allegation to be procedurally barred because the state court disposed of the claim under Texas' contemporaneous objection rule, and because Graves had not shown cause or prejudice for the default or that failure to consider the allegation would result in a fundamental miscarriage of justice. This court has found that the Texas contemporaneous objection rule constitutes an adequate and independent state ground and that failure to comply with this rule procedurally bars federal habeas review. Fisher v. Texas, 169 F.3d 295, 300 (5th Cir. 1999).

Graves' reliance on Lee v. Kemna, 534 U.S. 362 (2002), to overcome the procedural bar is misplaced. In Lee, the Supreme Court found that the state ground relied on by the Missouri Court of Appeals was inadequate to preclude federal habeas review because the government did not raise it until the appellate level and the defense had substantially complied with the procedural rule at trial. Id. at 380-85. This case is very different. Graves' attorneys did nothing to object to the prosecution's threat to charge Mathis. Defense counsel, rather than the prosecution, spoke to Mathis and it was defense counsel's comments and characterization of the prosecution's position that drove Mathis from the courthouse. Counsel did not timely inform the court on the record that Mathis was invoking the 5th Amendment and did not preserve her testimony in any fashion. Accordingly, we

10

agree with the district court that this claim is procedurally barred.

The district court also found that Graves failed to make the requisite showing of cause and prejudice for the default or a fundamental miscarriage of justice to overcome the procedural bar. Graves does not attempt to show cause and prejudice. Relying on Carter's recanted statement, Graves asserts actual innocence as the gateway through which the court should hear his claim on the merits. To meet this threshold, Graves must show that it is more likely than not that no reasonable juror would have convicted him in light of new evidence of his actual innocence. Schlup v. Delo, 115 S.Ct. 851, 867 (1995). Graves cannot meet this burden with the recanted testimony of Carter, given the numerous contradictory statements Carter has made and other evidence of Graves' guilt. Spence v. Johnson, 80 F.3d 989, 1003 (5th Cir. 1996) (quoting May v. Collins, 955 F.2d 299, 314 (5th Cir. 1992))(recognizing that "recanting affidavits and witnesses are viewed with extreme suspicion by the courts"). Also, Graves did call another witness, Arthur Curry, at trial. Curry supplied Graves with essentially the same alibi Mathis would have provided, so testimony that Mathis might have offered would be cumulative. Because Graves has not shown that reasonable jurists would find debatable the district court's ruling that he failed to justify his procedural default, we conclude that the district court correctly declined to reach the merits of this claim. Foster v. Johnson, 293 F.3d 766, 791 (5th Cir.), *cert. denied*, ___ U.S. ___, 123 S.Ct. 625 (2002).

VI.

Graves argues that the state deprived him of due process because it illegally suppressed evidence that Carter had made a statement that Carter's wife Cookie was an accomplice at the scene of the murders and because it allowed Carter to testify against Graves without revealing that information. Carter apparently implicated his wife in the murders during a polygraph examination by

11

the prosecution the night before he testified in Graves' trial. Graves' attorneys did not learn of the statements until a hearing in the first habeas proceedings in November 1998. Graves then raised these claims in his second habeas application, which claims were dismissed by the state court as an abuse of the writ under Texas law.

The district court found this claim to be procedurally barred because the state disposed of them under Texas' abuse of the writ rule and because Graves had not shown cause or prejudice for the default or that failure to consider the allegation would result in a miscarriage of justice. We doubt that Graves can establish that reasonable jurists would find this ruling debatable.[1] Even if he could overcome the procedural default, this claim fails to state the denial of a constitutional right.

To comply with the requirements of due process, the State must disclose material, exculpatory evidence. Brady v. Maryland, 373 U.S. 83, 87 (1963). To establish a Brady claim, a petitioner must demonstrate that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the petitioner; (3) the evidence was material either to guilt or punishment; and (4) nondiscovery of the allegedly favorable evidence was not the result of a lack of due diligence. Rector v. Johnson, 120 F.3d 551, 558 (5th Cir. 1997). To be material, the omitted evidence must create a reasonable doubt

_____

[1] The district court's opinion notes in a footnote that "While it may be true that Graves did not learn of Carter's statement about Cookie until November 15, 1998, several months following the filing of his initial habeas application, this fact does not necessarily render the state court's holding [that this claim was procedurally barred for abuse of the writ] unreasonable. The record reveals that the morning following his conversation with Carter, the district attorney disclosed to the trail court and defense counsel that Carter had taken a polygraph examination the previous evening, and the polygraph had revealed that his answers about his wife's involvement in the crime were deceptive. This disclosure arguably should have placed Graves' attorneys on sufficient notice to inquire into Graves' [sic] statements about Cookie on the night of the polygraph. In all likelihood, even minimal discovery would have revealed Carter's statement incriminating Cookie, such that Graves' attorneys could have timely included this argument in Graves' initial habeas application. In light of these facts, the Court cannot agree that the state court acted unreasonably in dismissing Graves' claims as an abuse of the writ."

12

that did not otherwise exist. United States v. Agurs, 96 S.Ct. 2392, 2402 (1976).

The evidence Graves relies on is not exculpatory or material. Graves argues that all parties and the jury were aware t hat at least two people were involved in the killings. The jury was not informed that Carter had ever named his wife as a participant which, according to Graves, would have made a substantial difference in the preparation of the defense and could have allowed the jury to infer that Carter and Cookie committed the murders. But, the possibility that Cookie might have been at the murder scene does not negate Carter's testimony that Graves was there also. "[T]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." Id. at 2400. Graves also argues that the state knowingly presented false testimony by allowing Carter to testify without revealing that his wife was involved. To obtain relief, the defendant must show that the testimony was false, the state knew it was false and the testimony was material. As stated above, this testimony was not material and Graves has not demonstrated that he is entitled to COA on this issue.

## VII.

In a second Brady claim, Graves complains that the state violated Brady when it suppressed a pre-trial statement by Carter that Graves was not involved in the Davis murders. More than five years after the trial, the district attorney, in a media interview, told a reporter that the night before Carter testified at Graves' trial, Carter told the D.A. that he committed the crime alone. However, Carter testified at trial that Graves was involved in the murders. The D.A. also allegedly told the media that Carter did not implicate Graves until the D.A. agreed not to ask Carter about the involvement of Carter's wife in the murders.

13

The Texas Court of Criminal Appeals dismissed Graves' claims on this point as an abuse of the writ because Graves did not raise this issue until his third application for state habeas relief. On the basis of the Texas court's disposition, the district court found this claim to be procedurally barred as an abuse of the writ. We disagree. Cause for a procedural default can exist when "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). A "showing that the factual or legal basis for a claim was not reasonably available to counsel" is such an external factor. Id. The government does not appear to dispute that Graves did not learn of Carter's pretrial exculpatory statement until June 2000 when the district attorney participated in a media interview. Based on the timing of the disclosure, we conclude that jurists of reason would find it debatable whether the district court was correct in its procedural ruling that Graves procedurally defaulted this claim by failing to assert it in his initial habeas petition, at a time when the alleged suppression had not been disclosed.

In addition, we find that jurists of reason would find it debatable whether Graves' petition states a valid claim of the denial of a constitutional right under Brady. We recognize that evidence of Carter's pretrial statement consists solely of an unverified transcript of the D.A.'s interview with a journalist. Assuming Graves can establish that the statement was made, no one disputes that the prosecution did not disclose this statement to the defense. The exculpatory statement, again if proven, was extremely favorable to Graves and would have provided powerful ammunition for counsel to use in cross-examining Carter. The impeachment value of this statement is even stronger when tied to the fact that Carter allegedly only changed his testimony when the state agreed not to question Carter about his wife's involvement in the murders. Finally, the state points to no lack of due diligence on the part of Graves or his counsel in discovering this evidence.

14

We recognize that Carter made other inconsistent statements, but the statement Carter made the night before he testified at trial is substantially different from his previous statement exonerating Graves before the grand jury. Before the grand jury, Carter testified that neither he nor Graves were involved in the murders. In the alleged pre-trial statement, Carter admitted that he committed the crimes alone. These multiple inconsistent statements may weigh against a conclusion that this final pretrial statement of Carter's would have affected the outcome of the trial. However, given that Graves' conviction rests substantially on Carter's testimony, the materiality of this statement is sufficiently close that a fact-finder should exercise its judgment on the matter after the benefit of an evidentiary hearing.

Accordingly, we grant COA on Graves' claim that the government failed to disclose Carter's exculpatory statement on the eve of trial in violation of Brady. We remand to the district court for an evidentiary hearing to determine the substance of the alleged statement and its materiality under Brady.

## VIII.

Graves argues next that his trial counsel was ineffective in failing to call three additional alibi witnesses. Graves acknowledges that this claim is procedurally barred because of the failure of state habeas counsel to raise the claim. He argues that the doctrine of fundamental miscarriage of justice exception should permit review of this claim. However, as stated above, Graves cannot meet this exception through claims of actual innocence based on the recanted testimony of Carter. Graves is not entitled to COA on this issue.

## IX.

Graves argues next that he was denied effective assistance of counsel on his Motion for New

Trial because his attorneys failed to provide an offer of proof of Mathis' testimony, failed to call the prosecutor to establish his state of mind at the time he asked the court to warn Mathis of her rights, and other errors. The Fifth Circuit has not yet determined whether the right to counsel attaches on a motion for new trial. See Mayo v. Cockrell, 287 F.3d 336, 339-40 & n.3 (5th Cir. 2002) (Having counsel during the motion for new trial phase may or may not be necessary to preserve the defendant's rights to a fair trial and effective appeal.) The Supreme Court also has not addressed this issue.

Assuming Graves was entitled to effective assistance of counsel to pursue the motion for new trial, we are satisfied that assistance by counsel was not ineffective. The state court explained counsel's failure to insist on calling Mathis as a strategic decision. This allowed the defense to taint the jury with a charge of prosecutorial misconduct related to the "threats" against Mathis. Also, the state court concluded that Mathis' alibi testimony would have been cumulative of the testimony of Arthur Curry and that even if counsel's performance was deficient, there was no prejudice because there was no reasonable likelihood that the outcome of the proceedings would have been different. The jury heard the substance of Graves' alibi and obviously rejected it.

> Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978); Murray v. Maggio, 736 F.2d at 282 (not favored in federal habeas review) (citing Boyd v. Estelle, 661 F.2d 388, 390 (5th Cir.1981)).

Schwander v. Blackburn, 750 F.2d 494, 500 (5th Cir. 1995). Graves is not entitled to COA on this issue.

## X.

Finally, Graves argues that he is entitled to COA on his claim of ineffective assistance of

16

counsel on his state habeas petition. First, the ineffectiveness or incompetence of counsel during federal or state collateral post-convictions proceedings is not a ground for relief. 28 U.S.C. § 2254(i). See also Ogan v. Cockrell, 297 F.3d 349, 357 (5th Cir.), *cert. denied*, 123 S. Ct. 582 (2002). Also, this claim is procedurally barred because the state court dismissed the claim as an abuse of the writ. Graves argues that in 1995 the Texas Legislature declared that all death row habeas corpus petitioners had the right to competent counsel. Art. 11.071, V.A.C.C.P. This circuit has rejected the argument that if a state chooses to appoint counsel for habeas proceedings, its act of grace triggers a constitutional right to effective representation in those proceedings. In re Goff, 250 F.3d 273, 275 (5th Cir. 2001). Graves is not entitled to COA on this issue.

## XI.

For the foregoing reasons, we grant Graves' Application for COA on his claim under Brady v. Maryland, 83 S.Ct. 1194 (1963), that the state failed to disclose to Graves that his co-defendant and key prosecution witness informed the district attorney that Graves was not involved in the charged crime on the day before he testified to the contrary at Graves' trial. We deny COA on Graves' remaining claims. We also remand this case to the district court for further proceedings in accordance with this opinion.

DENIED in part; GRANTED in part; REMANDED.