United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 2, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 04-70017
_____

GREGORY LYNN SUMMERS,

Petitioner-Appellant,

versus

DOUG DRETKE,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas
(No. 6:01-CV-139)
_____

Before JONES, BENAVIDES, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Petitioner-Appellant Gregory Lynn Summers ("Summers") appeals from the district court's

denial of his application for a writ of *habeas corpus*. Summers also seeks a Certificate of

Appealability ("COA") for claims not certified by the district court. Because Summers has failed

to carry his burden in both, we affirm the judgment of the district court and deny Summers's

application.

## I. FACTS AND PROCEEDINGS

### A. Underlying Crime and Involved Persons

Mandell Eugene Summers, Helen Summers, and Billy Mack Summers were fatally stabbed

and left in a burning building. Evidence at trial revealed that Summers hired Andrew Cantu to

- 1 -

murder Summers's relatives—father, mother, and uncle, respectively—for financial gain.[1]  For this crime, Texas tried, convicted, and sentenced Summers to death in 1991.

Cantu enlisted the aid of Raymond Gonzales and Paul Flores to carry out the act.  (Cantu had solicited another, Max Aguirre, but Aguirre declined to join the conspiracy.)  Cantu's payment was to be from money found in the house.  Among others, Aguirre, Flores, and Gonzales each testified in Summers's trial to statements made by Cantu regarding Summers.

After the publication of news reports on the crime, Keenan Wilcox contacted the police and described how Summers had approached him to perform the same acts, *i.e.*, the murder of Summers's relatives and the burning of their house.  Wilcox reported that Summers offered to pay for the crime with money found in the house and from insurance proceeds.  Wilcox testified about Summers's solicitation.

While in custody, Summers befriended William Spaulding, another inmate.  Spaulding assisted Summers with legal work and prepared documents for Summers.  When Spaulding realized that Summers was using documents prepared by Spaulding as false evidence, Spaulding contacted prison officials and told them of his encounter with Summers.  During their interactions, Summers told Spaulding of Summers's part in the murders.  Spaulding testified as to those events at Summers's trial.

## B.    Procedural History

The Texas Court of Criminal Appeals affirmed Summers's conviction on June 8, 1994.  On October 7, 1996, the United States Supreme Court denied Summers's petition for a writ of certiorari. On October 1, 1997, Summers filed a habeas petition with the district court in Taylor County.  The

---

[1] Texas executed Cantu in 1999 for his part in the crime.

Texas Court of Criminal Appeals denied this application for state post-conviction relief on March 28, 2001.[2]

On April 4, 2001, Summers filed an application for a writ of *habeas corpus* in the United States District Court for the Eastern District of Texas. He filed an amended application on November 15, 2001. Summers asserted ten claims for relief. The application was opposed by Appellee-Respondent Doug Dretke, Director, Texas Department of Criminal Justice (the "Director").

On March 4, 2004, the district court released a Memorandum Opinion and Order granting the Director's motion for summary judgment. No such motion had been filed. In response to Summers's Motion to Alter and Amend Judgment, the district court issued an Amended Judgment on March 24, 2004. The Amended Judgment read: "The Court, having considered the allegations in the petition, the authorities and exhibits in the application, answer, and reply, and the evidence in the record, finds that the application is not well-taken and it will be denied." The district court then entered judgment "for the Director on all claims in Summers' [sic] application."

Summers filed a Notice of Appeal on April 23, 2004. On May 10, 2004, the district court granted a COA for three of Summers's original ten claims—the second, fourth, and fifth. The three claims included in the COA are: (1) the trial court violated Summers's constitutional rights by admitting Cantu's statements into evidence; (2) the state violated Summers's constitutional rights by withholding exculpatory evidence relevant to the credibility of certain witnesses; and (3) the trial court violated Summers's constitutional rights by giving jurors misleading and constitutionally

---

[2] According to Summers, the Court of Criminal Appeals Order was dated March 28, 2001, but was mailed to counsel on March 26. Dretke cites the date as March 28, 2001 in his reply brief. The district court opinion cites the date as March 29, 2001.

defective instructions which prevented them from considering mitigating evidence at sentencing. The district court declined to issue a COA as to seven of Summers's claims. The parties have fully briefed the three certified issues, and the appeal currently pends before this court.

On August 3, 2004, Summers filed an Application for Additional Certificate of Appealability with this court, which raised four arguments: (1) this court should grant COA for all ten claims presented before the district court; (2) this court should grant COA for Summers's first, seventh, eight, ninth, and tenth claims; (3) reasonable jurists could disagree about whether Spaulding's testimony was admissible; and (4) reasonable jurists could disagree about the materiality of the testimony of Dr. Grigson, a witness for the state, and whether or not the state knowingly presented false evidence. The parties have fully briefed the application, which is currently pending before this court.

## II.  STANDARD OF REVIEW

Summers filed his petition for a writ of *habeas corpus* after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). As a result, the petition is subject to the procedures and standards imposed by AEDPA. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).

### A.  Appeal from a Denial of a Habeas Corpus Petition

"In a habeas corpus appeal, we review the district court's findings of fact for clear error and review its conclusions of law de novo, applying the same standard of review to the state court's decision as the district court." *Martinez v. Johnson*, 255 F.3d 229, 237 (5th Cir. 2001) (quoting *Thompson v. Cain*, 161 F.3d 802, 805 (5th Cir. 1998)). "A federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system."

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). As a result, whether at the district court or the circuit court, a federal court's review of a claim adjudicated in a state court is deferential:

> Under § 2254(d), a federal court cannot grant habeas corpus relief with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

*Hughes v. Dretke*, 412 F.3d 582, 588–89 (5th Cir. 2005) (citing 28 U.S.C. § 2254(d)). Moreover, this court has held that "a federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision." *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003) (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc)). *See also Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) ("The statute compels federal courts to review for reasonableness the state court's ultimate decision, not every jot of its reasoning.").

**(1)     Findings of Fact**

A state court's factual findings are "presumed to be correct." *Hughes*, 412 F.3d at 589 (citing 28 U.S.C. § 2254(e)(1)). Before a federal court, "a petitioner has the burden of rebutting this presumption with clear and convincing evidence." *Id*. (citing 28 U.S.C. § 2254(e)(1)).

**(2)     Conclusions of Law**

Under AEDPA, a federal court's assessment of a state court's conclusions of law is similarly deferential. The Supreme Court has determined that section 2254(d)(1) affords a petitioner two avenues, "contrary to" and "unreasonable application," to attack a state court application of law.

*See Williams v. Taylor*, 529 U.S. 362, 405 (2000) (noting the clauses have "independent meaning").

Under the first clause:

> a state court decision is "contrary to . . . clearly established Federal law, as determined by the Supreme Court" if:  (1) "the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or (2) "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent."

*Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002) (quoting *Williams*, 529 U.S. at 405–06).

Under the second clause, "a state court decision is 'an unreasonable application of clearly established' Supreme Court precedent if the state court 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'" *Id.* (quoting *Williams*, 529 U.S. at 407–08).  The Supreme Court provided further guidance:

> First, the Court indicated that the inquiry into unreasonableness is an objective one.  Second, the Court emphasized that "unreasonable" does not mean merely "incorrect":  an application of clearly established Supreme Court precedent must be incorrect and unreasonable to warrant federal habeas relief.

*Id.* (citing *Williams*, 529 U.S. at 409–12) (internal citations omitted).  *See also Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004) ("[F]ederal habeas relief is only merited where the state court decision is both incorrect and objectively unreasonable.").  Only if a state court's application of federal constitutional law fits within this paradigm may this court grant relief.

**B.     Application for Additional COA**

This court will grant a COA only if the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To satisfy this standard, a petitioner must "demonstrate[e] that jurists of reason could disagree with the district court's resolution of his

constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327. The Supreme Court instructs that the "question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Id.* at 342. Finally, "[b]ecause the present case involves the death penalty, any doubts as to whether a COA should issue must be resolved in [petitioner's] favor." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000). This court may not grant a COA if there is no doubt that reasonable jurists would agree with the district court's resolution and that the issues presented are not adequate to deserve encouragement.

### III. DISCUSSION

This is a case in two parts: the appeal, pursuant to the COA issued by the district court, and the application for an additional COA. We take the second part first and address the additional COA before reaching the substance of the appeal.

### A. Application for Additional COA

Under AEDPA, a petitioner must obtain a COA, from either a district court judge or a circuit court judge before he can appeal the district court's denial of habeas relief. *See* 28 U.S.C. § 2253(c). *See also Miller-El*, 537 U.S. at 336 ("[U]ntil a COA has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners."). To determine whether a COA should be granted requires an overview of the claims in the habeas petition and a general assessment of their merits. This court looks to the district court's resolution of the petitioner's constitutional claims and asks whether it was debatable amongst jurists of reason. "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it." *Brown v. Dretke*, 419 F.3d 365, 370 (5th Cir. 2005) (citing

*Miller-El*, 537 U.S. at 336).

After the district court refused to issue a COA as to all of his claims, Summers filed an Application for Additional Certificate of Appealability with this court. In the application, Summers raised four arguments: (1) this court should grant COA for all ten claims presented before the district court; (2) this court should grant COA for Summers's first, seventh, eight, ninth, and tenth claims; (3) reasonable jurists could disagree about whether Spaulding's testimony was admissible; and (4) reasonable jurists could disagree about the materiality of Dr. Grigson's testimony and whether the state knowingly presented false evidence.

**(1)     COA for all Ten Claims**

Because the district court approached the issues presented as though the Director had filed a summary judgment, Summers believes that the entire analysis is invalid and that this court should grant a COA with respect to all of the issues raised before the district court. We disagree.

It is true that the original judgment in favor of the Director was based, in part, on the summary judgment standard. To the extent that the district court's use of the summary judgment standard for the standard of review under AEDPA altered its analysis, the effect was to make finding in favor of the Director more difficult, not less. Nevertheless, the district court granted Summers's motion to alter or amend the judgment. As a result, the district court's final judgment, the judgment under consideration for the additional COA, was entered without using the summary judgment standard.

Summers does not cite authority for the proposition that application of the summary judgment standard mandates the grant of a COA. Finally, and conclusively, because Summers has not even alleged that a "denial of a constitutional right," 28 U.S.C. § 2253(c)(2), resulted from the

complained-of actions, a COA is not merited for all ten issues raised before the district court.

**(2)      COA for Summers's First, Seventh, Eighth, Ninth, and Tenth Claims**

Summers maintains that the first, seventh, eighth, ninth, and tenth claims raised before the district court cannot be briefed because of page limitations.  Rather, Summers directs this court to the briefing before the district court for support of his request for a COA as to these claims.  We decline this request.  By failing to adequately brief these issues, Summers has waived them.  *See Hughes*, 412 F.3d at 597; *Lookingbill v. Cockrell*, 293 F.3d 256, 263 & n.11 (5th Cir. 2002).

**(3)      COA for the Admissibility of Spaulding's Testimony**

Spaulding made Summers's acquaintance while they were both inmates at the Taylor County Jail.  Spaulding's testimony is corroborating evidence of a conspiracy and therefore was instrumental to the entry of testimony under the co-conspirator exception.  Summers claims that reasonable jurists could disagree about whether Spaulding's testimony was admissible.  The district court denied habeas relief and a COA on this claim.  Summers now seeks a COA from this court.

With respect to Spaulding's testimony, Summers asserts three sub-claims:  (1) that Spaulding, acting as an agent of the state, questioned him in violation of *Massiah v. United States*, 377 U.S. 201 (1964); (2) that the state knowingly sponsored Spaulding's false testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972); and (3) that the state failed to disclose Spaulding's relationship with authorities in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  Each of these claims depends on Summers's presumption that Spaulding lied when he testified at trial to the following facts:  (1) that Summers approached Spaulding (and not vice versa); (2) that Spaulding testified as to information gained before contact

with authorities; and (3) that the state had not offered Spaulding anything in exchange for his testimony.

In support of his position, Summers relies exclusively on a 1997 affidavit from Spaulding, which was introduced at Summers's habeas proceedings. In that affidavit, Spaulding said, contrary to his trial testimony, that Taylor County detectives contacted him before Summers confided in him. Also, Summers claims that the detectives asked Spaulding to obtain incriminating information from Summers. Finally, Summers describes some benefits Spaulding received as a result of his testimony. If these statements could be taken as true, Summers would, likely, merit a COA. However, under AEDPA, the COA must be denied.

The state habeas court has had the opportunity to address the same issue presented here and made specific findings that directly controvert Summers's position:

> William Spaulding was not an agent of the State when [Summers] told him of [Summers]'s involvement in the murder for hire of his parents and uncle. William Spaulding did not question or solicit information from [Summers] at the State's request. The State's agents did not approach Mr. Spaulding to testify against [Summers]; instead, Mr. Spaulding approached law enforcement personnel. Mr. Spaulding testified at trial only about [Summers]'s statements to him before Mr. Spaulding contacted law enforcement officers. Mr. Spaulding's testimony at trial was not false, misleading, or incomplete.

AEDPA mandates that these findings are "presumed to be correct." *Hughes*, 412 F.3d at 589 (citing 28 U.S.C. § 2254(e)(1)). Moreover, Summers "has the burden of rebutting this presumption with clear and convincing evidence." *Id*. (citing 28 U.S.C. § 2254(e)(1)). Finally, where, as here, the state habeas court has made a credibility determination, that finding is also afforded deference

under AEDPA.[3] *Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005) (noting that a federal habeas court "may not substitute its own credibility determinations for those of the state court simply because it disagrees with the state court's findings"); *id.* at 333 (Garza, J., dissenting) (same); *Pondexter*, 346 F.3d at 149–50.

The district court concluded that Spaulding's 1997 affidavit failed to rebut the presumption in favor of state courts' factual findings. We agree. This circuit has long viewed recanting affidavits with "extreme suspicion." *Baldree v. Johnson*, 99 F.3d 659, 663 (5th Cir. 1996). *See also Graves v. Cockrell*, 351 F.3d 143, 153 (5th Cir. 2003); *Spence v. Johnson*, 80 F.3d 989, 1003 (5th Cir. 1996); *United States v. Adi*, 759 F.2d 404, 408 (5th Cir. 1985). This affidavit is no different; it stands alone, uncorroborated, and unsupported.[4] With such scant support, this court is in no position to disturb the factual findings of a state court. Because all of the claims relating to the COA for the Spaulding testimony are dispensed with once the factual findings of the state court are accepted, we need not discuss the sub-claims in detail. Finding the point beyond debate, we deny a COA as to the Spaulding testimony's admissibility.

**(4)     COA for the Admissibility of Dr. Grigson's Testimony**

Dr. Grigson testified as a witness for the state in the penalty phase. Dr. Grigson testified that

---

[3]This deference existed even before AEDPA. *See Carter v. Johnson*, 131 F.3d 452, 463 (5th Cir. 1997) ("[W]e are required to accept, as conclusive, both the factual findings and the credibility choices of the state courts.").

[4] Summers looks to *Guy v. Cockrell*, 343 F.3d 348 (5th Cir. 2003), in support of his position that this court should accept the 1997 affidavit as true. However, the *Guy* court expressly limited its ruling to the circumstances of that case. In *Guy*, because the state had waived its exhaustion defense, there was no state habeas record and no findings of fact to which the court was required to defer under AEDPA. *See id.* at 351–52. *Guy* cannot be read as an endorsement of this circuit's preference for post-trial affidavits over state courts' factual findings.

Summers represented a future danger. Summers contends that reasonable jurists could disagree about whether Dr. Grigson's testimony was admissible. With respect to Dr. Grigson's testimony, Summers asserts two sub-claims: (1) that the state knowingly sponsored Dr. Grigson's false testimony in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972), and (2) that the state withheld exculpatory evidence regarding Dr. Grigson's history as a witness in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The district court denied habeas relief and a COA on this claim. Summers now seeks a COA from this court.

**a.     The *Napue/Giglio* Claim**

For Summers to prevail under *Napue/Giglio*, he must prove that Dr. Grigson's testimony was (1) false, (2) known to be so by the state, and (3) material. *See United States v. Mason*, 293 F.3d 826, 828 (5th Cir. 2002) ("To prove a due process violation, the appellants must establish that (1) [the witness] testified falsely; (2) the government knew the testimony was false; and (3) the testimony was material."). In the context of an application for the COA, Summers must show that the district court's disposition of the claim is debatable. We find it is not.

The district court found that Summers had rebutted the state habeas court's presumption of correctness with respect to the first two of three elements of *Napue/Giglio*. However, the district court denied relief when it determined that Dr. Grigson's testimony was immaterial as to the final outcome in the penalty phase. Summers, in his application for an additional COA, contends that "the District Court's holdings and the evidence presented by Mr. Summers indicate that the issue of materiality in this instance is debatable." Leaving aside the correctness of the district court's

resolution of the first two elements of *Napue/Giglio*,[5] Summers fails to appreciate that an affirmative answer on those first two elements has no effect on the materiality inquiry.

Where a state habeas court has made express findings on the issue of materiality, we are precluded from affording habeas relief under AEDPA unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Here, the state habeas court made express findings, unchallenged by Summers, that foreclose relief under AEDPA: "The evidence to support [Summers]'s future dangerousness was overwhelming even without the testimony of Dr. Grigson. Dr. Clay Griffith testified in a manner that virtually echoed Dr. Grigson's testimony. Dr. Griffith's testimony is not attacked." In response, Summers cites, *inter alia*, *Gardner v. Johnson*, 247 F.3d 551 (5th Cir. 2001), and argues that psychiatric testimony is especially prejudicial. Summers overlooks the fact that, contrary to *Gardner*, where the psychiatric testimony "was the centerpiece of the evidence presented by the State during the punishment phase," *id.* at 562, the testimony in question here was mirrored by another psychiatrist whose testimony remains unchallenged. In addition to the psychiatric testimony, the state presented numerous witnesses in support of its future dangerousness claim.

Summers also relies on an affidavit from a juror, in which the juror states that Dr. Grigson's testimony made up part of the "most influential testimony" from the penalty phase. Leaving aside

---

[5] The state habeas court made express factual findings on this issue. Summers produced evidence which, in the opinion of the district court, contradicted those findings. Because it does not alter the outcome of this appeal, we make no comment on the district court's rejection of a portion of the state court's findings, except to note that the clear and convincing standard is a high one. *See Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001).

- 13 -

the point that the juror identifies Dr. Grigson's testimony as only a part of the influential testimony,[6] this portion of the affidavit is inadmissible and cannot be considered. Under Rule 606(b) of the Federal Rules of Evidence, jurors' affidavits are inadmissible "regarding the following four topics: (1) the method or arguments of the jury's deliberations, (2) the effect of any particular thing upon an outcome in the deliberations, (3) the mindset or emotions of any juror during deliberation, and (4) the testifying juror's own mental process during the deliberations." *Pyles v. Johnson*, 136 F.3d 986, 991 (5th Cir. 1998) (citing *United States v. Ortiz*, 942 F.2d 903, 913 (5th Cir. 1991)). Indeed, in matters involving a death sentence, this circuit has noted that "we are convinced that Rule 606(b) does not harm but helps guarantee the reliability of jury determinations in death penalty cases." *United States v. Jones*, 132 F.3d 232, 246 (5th Cir. 1998) (citing *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)).

As to the materiality prong, Summers's argument is unavailing. The state habeas court, the district court, and this court all agree that Dr. Grigson's testimony contributed little in light of the wealth of future dangerousness evidence presented by the state. Summers has failed to show that reasonable jurists could disagree with the district court's resolution of this *Napue/Giglio* claim.

**b.** **The *Brady* Claim**

Summers's *Brady* sub-claim with respect to Dr. Grigson's testimony relies on a letter written by Norman Kinne, a Dallas County assistant district attorney, to Dr. Grigson. The letter, referred to as the "Kinne Report," enclosed a report on inmates in Dallas County with commuted death sentences. According to Summers, the letter is exculpatory evidence of "the extent of Dr. Grigson's

---

[6] The juror identified the combination of both Dr. Grigson's testimony and Darrell Shirlls's testimony as "the most influential testimony" from the penalty phase.

inaccurate prior predictions." Summers alleges that the prosecution withheld this evidence in violation of *Brady*.

To make a *Brady* claim, Summers must prove: (1) that the "evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching;" (2) that the "evidence [has] been suppressed by the State, either willfully or inadvertently;" and (3) that "prejudice [has] ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Before a *Brady* claim can arise, Summers must show that the prosecution team had access to the evidence. *See United States v. Webster*, 392 F.3d 787, 798 n.20 (5th Cir. 2004) (discussing the imputation of knowledge within the prosecution team). He has made no such claim. Indeed, the state habeas court concluded just the opposite: "No person connected with [Summers]'s case as a prosecutor, prosecutorial staff, or law enforcement officer had knowledge of the 'Kinne letter' or the information contained in the letter."

The district court ruled that Summers failed to establish that the prosecution knew of the Kinne Report. This ruling misstates the law. Under AEDPA, the question is not whether or not the petitioner proved his claim, but whether or not the state court's findings to that effect were sufficiently rebutted. AEDPA places the burden on the petitioner to rebut the presumption of correctness of the state court's findings. Because he offered no evidence of knowledge of the Kinne Report on the part of the prosecution, Summers cannot overcome the presumption of correctness.

Moreover, the lack of materiality of Dr. Grigson's testimony is as damaging to Summers's *Brady* claim as it was to his *Napue/Giglio* claim. Because of the relative insignificance of Dr. Grigson's testimony, Summers cannot show prejudice. As Summers cannot satisfy any aspect of

*Brady*, the district court's rejection of this claim is beyond debate.  No COA will issue.

**B.      Appeal from a Denial of a Habeas Corpus Petition**

Having addressed the application for additional COA, we now turn to the three issues for which the district court granted a COA.  They are:  (1) the trial court violated Summers's constitutional rights by admitting Cantu's statements into evidence; (2) the state violated Summers's constitutional rights by withholding exculpatory evidence relevant to the credibility of certain witnesses; and (3) the trial court violated Summers's constitutional rights by giving jurors misleading and constitutionally defective instructions which prevented them from considering mitigating evidence at sentencing.  We address each seriatim.

**(1)      The Admissibility of Cantu's Statements**

On behalf of the state, Paul Flores and Raymond Gonzales testified as to statements about Summers made out-of-court by Andrew Cantu, now deceased.  Summers asserts that the admission of the statements violated his constitutional right to confront witnesses against him.  With respect to the admission of Cantu's out-of-court statements, Summers raises three sub-claims:  (1) that there was insufficient independent evidence of a conspiracy; (2) that the trial court should have conducted a *James* hearing; and (3) that the trial court should have admitted another of Cantu's out-of-court statements perceived by Summers as impeaching Cantu's credibility.  The district court denied habeas relief, but granted a COA on this issue.

**a.      Independent Evidence of a Conspiracy**

Summers maintains that, aside from the statements themselves, the state produced insufficient independent evidence to support the admission of those statements under the co-conspirator exception.  While it may be true that this circuit and many others have required

- 16 -

independent evidence in support of a conspiracy, *see, e.g., United States v. Narviz-Guerra*, 148 F.3d 530, 536 (5th Cir. 1998), that is not the question before this court. We need not reach the issue. The doctrine of federalism, as embodied in AEDPA, precludes the result Summers urges. Under AEDPA, the state courts are bound, not by our jurisprudence or the jurisprudence of our sister circuits, but by "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The Supreme Court has not mandated a requirement for independent evidence in support of a conspiracy finding under the Confrontation Clause. *See Bourjaily v. United States*, 483 U.S. 171, 182 (1987) (ho lding that "independent indicia of reliability [are] . . . not mandated by the Constitution."). Indeed, just the opposite is true: "*Bourjaily* declined to decide whether there must be any evidence independent of coconspirator statements to determine that a conspiracy has been established by a preponderance of the evidence." *United States v. Fragoso*, 978 F.2d 896, 901 (5th Cir. 1992) (citing *Bourjaily*, 483 U.S. at 179, 181). Because the Supreme Court does not require it, Summers's demand for independent evidence of a conspiracy fails. The state court's application of law accords with the mandates of the Supreme Court. Whether we agree or not, it is not contrary to, nor an unreasonable application of, the Confrontation Clause as announced by the Supreme Court. We cannot grant habeas relief.

Moreover, the state habeas court identified two items that corroborated the conspiracy finding: Spaulding's testimony regarding Summers's confession and a letter from Summers to Spaulding.[7] Summers takes issue with the admissibility of the state's corroborating evidence as a

---

[7]In his brief the Director identified more evidence corroborating the conspiracy finding, *e.g.*, the testimony of both Aguirre (circumstances of meetings between Summers and Cantu) and Wilcox (prior attempts at hiring someone to murder his parents).

general matter, but the Constitution does not prevent a state court from considering possibly inadmissible evidence to determine the admissibility of other evidence. *See Bourjaily*, 483 U.S. at 178 (holding that a court may determine admissibility by "considering any evidence it wishes, unhindered by considerations of admissibility") (applying FED. R. EVID. 104(a)).

In addition, Summers claims that Aguirre's testimony does not prove the conspiracy. However, even if the Aguirre testimony alone is insufficient, the Supreme Court has been clear that the testimony can make up part of the admissibility analysis. *See Bourjaily*, 483 U.S. at 180 ("[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it."). The state court found the supporting evidence, in conjunction with the statements, sufficient to prove the statements' reliability, and we are in no position to upset that finding where, as here, it is not unreasonable.

### b.    *James* **Hearing & Express Findings**

Summers argues that the state court's refusal to grant his motion for a *James* hearing—an independent hearing to determine the existence of a conspiracy—violated his due process rights. The Director points us to the record which indicates that, in response to Summers's motion for a *James* hearing, the state trial judge looked to the results of the trial of the co-conspirator, Cantu, in lieu of an independent hearing. As before, AEDPA bars Summers's claim because a *James* hearing is a product of Fifth Circuit jurisprudence, not the Supreme Court's.

While a *James* hearing is not mandated, Supreme Court precedent does require that "a court must be satisfied that the [co-conspirator's] statement actually falls within the definition of the Rule." *Bourjaily*, 843 U.S. at 175. Summers's appeal could be read to articulate a claim demanding such a finding. However, this claim must also fail:

- 18 -

> As a federal habeas court, we are bound by the state habeas court's factual findings, both implicit and explicit. Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

*Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004). As the state habeas court concluded, "The issues relating to [the co-conspirator statements] were raised, considered, and rejected on direct appeal. Because the state trial court admitted Cantu's out-of-court statements under the co-conspirator exception and, later, denied Summers's motion for a directed verdict, the state trial court must have concluded that the conspiracy existed. *See Fragoso*, 978 F.2d at 900–01. Under AEDPA, the state court need do no more.

c.      **Cantu's Impeachment**

Summers asserts that the state trial court's refusal to admit Cantu's purportedly impeaching statement deprived Summers of the ability to attack Cantu's credibility. This, according to Summers, violated his right to confront witnesses against him. In retort, the Director contends that Summers presented this claim, not as a constitutional claim, but as a violation of state evidentiary law. The Director is partially correct. On direct appeal, the issue was decided exclusively on the basis of state law. However, Summers resists this argument and urges this court to recognize his citations to *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), *Davis v. Alaska*, 415 U.S. 308 (1974), *Pointer v. Texas*, 380 U.S. 400 (1965), and *Smith v. Fairman*, 862 F.2d 630 (7th Cir. 1988), as stating a constitutional claim. Because of the gravity of the matter, we will assume a constitutional claim was raised.

Of the cases Summers cites, only *Smith* pronounces a rule that supports his claim. *See Smith*,

862 F.2d at 638 ("[P]rior inconsistent statements of a hearsay declarant . . . were analogous to 'otherwise appropriate cross-examination. . . .'"). Under AEDPA, reliance on *Smith* is not enough. Because it is derived from a circuit court, not the Supreme Court, the rule in *Smith* is irrelevant for the purposes of our habeas review. The only question is whether or not the state trial court's exclusion of Cantu's statement was contrary to, or involved an unreasonable application of clearly established constitutional law, as announced by the Supreme Court. We hold it did not.

No doubt a hearsay declarant may be subjected to impeachment, in the same manner as a live witness. *See United States v. Moody*, 903 F.2d 321, 328 (5th Cir. 1990). However, the confrontation clause "does not guarantee 'cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *United States v. Smith*, 930 F.2d 1081, 1088 (5th Cir. 1991) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam)). The rules of evidence, to the extent they do not violate the Constitution, bind the prosecution and defense alike. Moreover, trial judges "'retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits' on cross-examination." *Id.* (quoting *Van Arsdall*, 475 U.S. at 679). The state trial court determined that the impeachment evidence was inadmissible. The limitation imposed by the state trial court in this instance was not unreasonable.

Summers also invokes *Crawford v. Washington*, 541 U.S. 36 (2004), where the Supreme Court established "a categorical rule barring the admission of out-of-court testimonial statements against the accused absent opportunity for cross-examination." *United States v. Holmes*, 406 F.3d 337, 347 (5th Cir. 2005) (discussing *Crawford*). The Director counters by pointing out that *Crawford* is of no use to Summers because it is not retroactive. Whether retroactive or not, an issue unresolved in this circuit, *see Lave v. Dretke*, 416 F.3d 372, 378-79 (5th Cir. 2005) (granting COA

on the issue), and which we decline to reach, *Crawford* does not control here.

The rule in *Crawford* addressed only testimonial evidence, *see id.* at 68, and "[t]here is nothing in *Crawford* to suggest that 'testimonial evidence' includes spontaneous out-of-court statements made outside any arguably judicial or investigatory context." *Ramirez v. Dretke*, 398 F.3d 691, 965 n.3 (5th Cir. 2005). As an example of "statements that by their nature were not testimonial," the Supreme Court specifically listed "statements in furtherance of a conspiracy." *Crawford*, 541 U.S. at 55. *See also id.* at 74 (Rehnquist, C.J., concurring in judgment); *United States v. Rueda-Rivera*, 396 F.3d 678, 680 (5th Cir. 2005). With respect to the statements at issue here—nontestimonial out-of-court statements in furtherance of a conspiracy—it is clear that *Ohio v. Roberts*, 448 U.S. 56 (1980), continues to control. *See Crawford*, 541 U.S. at 68; *Holmes*, 406 F.3d at 348. The state courts' treatment of Summers's confrontation clause rights was not unreasonable.

**(2)    The *Brady* Claims**

As detailed above:

> the Supreme Court framed "the three components or essential elements of a *Brady* prosecutorial misconduct claim: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'"

*Medellin v. Dretke*, 371 F.3d 270, 280–81 (5th Cir. 2004) (quoting *Banks v. Dretke*, 540 U.S. 668, 691 (2004))).

"Evidence is 'material' if there is a reasonable probability that, had the evidence been disclosed, the result at the trial would have been different; a reasonable probability is one that undermines confidence in the outcome of the trial." *Duncan v. Cain*, 278 F.3d 537, 539–40 (5th Cir.

- 21 -

2002) (citing *United States v. Bagley*, 473 U.S. 667, 682, 685 (1985)). Whether evidence is material under *Brady* is a mixed question of law and fact. *Trevino v. Johnson*, 168 F.3d 173, 185 (5th Cir. 1999).

### a.  Keenan Wilcox—Rewards for Testimony

Summers claims that Wilcox received a reward for his testimony and, while testifying on the state's behalf, was a drug addict and dealer.[8]  Further, Summers says that the state failed to disclose these facts to the defendant in violation of *Brady*.  The Director counters by referring to Wilcox's trial testimony and the state habeas court's findings.  We deny habeas relief on this claim.

At Summers's trial, Wilcox testified that he was not expecting a reward for his testimony and that he was not promised anything to cooperate with the prosecution.  In response to this testimony, Summers offers an affidavit, sworn to by Summers's attorney, regarding a conversation with Wilcox in 1997.  The affidavit contains contentions that (1) Wilcox "sought, received, [sic] a reward for the information he provided to the prosecution" and (2) Wilcox "had been treated very well by the District Attorney's office," *i.e.*, "he had not been charged with any drug offenses."  With respect to this affidavit, the state habeas court specifically found that the affidavit "does not show that Keenan Wilcox gave false testimony at [Summers]'s trial, nor that deals were made between the State and Mr. Wilcox in exchange for his testimony."  The state habeas court went on to find "insufficient evidence" for both of the contentions in the affidavit.

Under AEDPA, the state habeas court's resolution is entitled to a presumption of correctness,

---

[8] Summers proposes that Wilcox was the beneficiary of some *quid pro quo* for his testimony.  To the extent that Summers argues that the drug involvement was relevant to Wilcox's credibility, we also deny relief.  Both the Director and the district court identified several references to drug use and culture during Wilcox's testimony.  Therefore, the jury members were aware of this aspect of his character when they determined Wilcox's credibility.

unless rebutted by clear and convincing evidence. *See Brown v. Dretke*, 419 F.3d 365, 371 (5th Cir. 2005) (citing 28 U.S.C. § 2254(e)(1)). However, this affidavit stands alone, and Summers offers no corroboration for it. Further, the evidence offered is less reliable than the recanting 1997 affidavit discussed above.[9] As we did then, we view recanting affidavits with "extreme suspicion." *Baldree v. Johnson*, 99 F.3d 659, 663 (5th Cir. 1996). *See also Graves v. Cockrell*, 351 F.3d 143, 153 (5th Cir. 2003); *Spence v. Johnson*, 80 F.3d 989, 1003 (5th Cir. 1996); *United States v. Adi*, 759 F.2d 404, 408 (5th Cir. 1985). The allegations in the affidavit, even if true, prove too little to carry Summers's burden. Absent is any contention that a reward came *before* Wilcox's testimony or that Wilcox was *actually* promised any special treatment.

Under AEDPA, this affidavit fails to upset the factual findings of the state habeas court. Because the state habeas court concluded that Wilcox's testimony did not involve a *quid pro quo*, there was nothing for the prosecution to disclose and, ultimately, no *Brady* violation. The state habeas court's conclusion that "[t]he affidavit does not undermine confidence in Mr. Wilcox's testimony, nor the verdict" is not unreasonable.

**b.      William Spaulding**

According to Summers, the prosecution withheld two pieces of information, pertaining to Spaulding, in violation of *Brady*. Summers claims: (1) that law enforcement officials had threatened Spaulding and caused him to reverse his testimony and (2) that the prosecution withheld Spaulding's prison records, which indicate he had been involved with acts of deceit in prison. The district court denied habeas relief. We agree.

---

[9] We note that Wilcox did not make the declaration on which Summers relies. The affidavit is that of Summers's attorney recounting a conversation with Wilcox. The additional link in the chain makes the affidavit even less reliable.

**(i)    Spaulding's "Relationship" with the Prosecution**

Summers supports his claim that law enforcement officials forced Spaulding to change his story and testify for the prosecution by reference to the 1997 affidavit discussed above. *See supra* Part III.A.3. In Summers's view, the involvement between law enforcement and the witness should have been disclosed to the defense. The same deficiencies with the 1997 affidavit that undermined Summers's earlier claim are fatal to this *Brady* claim. As discussed above, the state habeas court concluded that "Spaulding's testimony at trial was not false, misleading, or incomplete," and that there was "insufficient evidence to support a finding that Mr. Spaulding was coerced or threatened or otherwise made or improperly caused to give testimony at trial against [Summers]."

Under AEDPA, we must accept as true all reasonable fact findings of the state courts unless the petitioner disproves them by clear and convincing evidence. *See Ramirez v. Dretke*, 398 F.3d 691, 965 (5th Cir. 2005); 28 U.S.C. § 2254(e)(1). As before, the 1997 affidavit fails to carry this burden. As a result, we must presume that the prosecution did not coerce Spaulding, leaving nothing for the prosecution to disclose under *Brady*.

**(ii)    Spaulding's Prison Records**

Summers contends that the State withheld Spaulding's prison records, which purportedly contain impeachment evidence of prison discipline for forgery. The Director responds by asserting a procedural bar to this claim. According to the Director, because the claim was not properly presented to the state court on direct appeal or on collateral review, Summers cannot assert it in a federal habeas proceeding. The Director is correct.

Because of "the principles of comity, finality, and federalism" imbued in AEDPA, a federal habeas court must be "careful to limit the scope of federal intrusion into state criminal adjudications

and to safeguard the States' interest in the integrity of their criminal and collateral proceedings." *Williams v. Taylor*, 529 U.S. 420, 436 (2000). *See also* 28 U.S.C. § 2254(b)(1)(A). Accordingly, a federal habeas court, considering the claims of a state prisoner, cannot grant relief on a claim unless it has been fairly presented to or diligently pursued before the state courts. *Williams*, 529 U.S. at 437 ("For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error."). *See also Duncan v. Henry*, 513 U.S. 364, 365 (1995) ("[E]xhaustion of state remedies requires that petitioners fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners federal rights. . . ." (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971))) (alteration in original) (internal quotations omitted).

The Director identifies a claim in the state habeas proceeding wherein Summers posited that "it is possible that, upon disclosure, further instances of the failure to disclose exculpatory information might be found." Our review of the record does not reveal any other claims before the state courts that fit the issue now presented. For his part, Summers identifies no portion of the record wherein he presented this claim to the various st ate courts that have considered his case. Rather he merely states that he "did allege the claim and ask[ed] the state court for the opportunity to further develop" the issue. This is not enough.

"To exhaust, the applicant must fairly present the substance of his claims to the state court." *Neville v. Dretke*, 423 F.3d 474, 478 (5th Cir. 2005) (citing *Picard*, 404 U.S. at 275). The only passage identified in the state proceedings that may have been related to this claim fails in this regard. We find no argument to the state court that can be said to have presented this claim, and

Summers identifies none. Because Summers failed to exhaust this alleged constitutional violation before the state courts, we cannot reach it now.[10]

**c.      Darrell Shirlls—Additional Pending Charges**

During the penalty phase, Shirlls testified on behalf of the state that Summers had threatened to have another witness killed if that witness testified against Summers. Summers brings a *Brady* challenge claiming that the state withheld information of pending charges against Shirlls. According to Summers, this evidence co uld have been used to impeach Shirlls and would have resulted in a different outcome in the penalty phase. *Brady* requires that the prosecution disclose evidence even if its only use is to impeach prosecution witnesses. *See Felder v. Johnson*, 180 F.3d 206, 212 (5th Cir. 1999) (citing *Bagley*, 473 U.S. at 676).

The Director contends that the evidence of pending charges, which the state purportedly suppressed, is inadmissible even as impeachment evidence and, therefore, cannot be material under *Brady*. In support of this contention, the Director cites *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995), where the Supreme Court found that the suppression of polygraph evidence was "not 'evidence' at all" because it was "inadmissible under state law, even for impeachment purposes." In sum, the Court concluded that "[d]isclosure of the polygraph results, then, could have had no direct effect on

---

[10] Even if Summers's version of events is believed, he failed to exercise diligence in pursuing his claim. He contends that he asked the prosecutor's office for Spaulding's prison records, but, when denied, Summers failed to enforce his perceived rights and obtain a court order. *See, e.g., Williams*, 529 U.S. at 436 (finding that petitioner did not pursue a *Brady* claim with due diligence where "it appear[ed] counsel made no further efforts to find the specific report" after the prosecutor refused to produce it). In addition, in Summers's motion to reconsider the denial of his habeas corpus application and request for evidentiary hearing, Summers failed to mention this claim or the need for an evidentiary hearing to advance or resolve it. He cannot do so now. Moreover, were we to reach the merits of this claim under 28 U.S.C. § 2254(b)(2), we would deny the claim for the reasons stated by the district court.

the outcome of trial, because respondent could have made no mention of them either during argument or while questioning witnesses." *Id.*

We need not decide whether *Wood* controls here[11] because on "the general question whether the disclosure of the evidence would have created a reasonable probability that the result of the proceeding would have been different," *Felder*, 180 F.3d at 212, the answer is clear. It would not. The burden falls on Summers to convince this court "that there is a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Strickler v.Greene*, 527 U.S. 263, 289 (1999) (internal quotations omitted). *See also Martin v. Cain*, 246 F.3d 471, 477 (5th Cir. 2001) (quoting *Bagley*, 473 U.S. at 682).

As the district court observed, the state presented a wealth of evidence regarding future dangerousness during the penalty phase. Moreover, the jury and the parties were aware both that Shirlls was in prison during the time the events about which he testified took place and that he faced criminal prosecution during the time of his testimony. Whatever the effect of any nondisclosure about additional pending charges on the jury and the trial, "there [was] never a real '*Brady* violation'" because any nondisclosure was not "so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281. The state habeas court's rejection of this claim was not unreasonable.

**(3)   Jury Instructions**

Summers contends that the jury instructions used in the penalty phase of his trial failed to

---

[11] We also do not reach the issue of whether inadmissible evidence is material for *Brady* purposes in light of *Wood*. *Accord Felder*, 180 F.3d at 212.

meet the constitutional requirements of the Sixth, Eighth, and Fourteenth Amendments.[12]  Texas's

use of special issues as a vehicle for giving effect to mitigating evidence is well established.  *See*

*Coble v. Dretke*, 417 F.3d 508, 523 (5th Cir. 2005) (citing *Jurek v. Texas*, 428 U.S. 262, 276 (1976)

(plurality opinion) for the proposition that "the Supreme Court expressly upheld the constitutionality

of the manner in which mitigating evidence is considered under the 'special issues' submitted to

juries in Texas capital cases").  Summers's specific argument is that the jury instructions used in his

trial fail because they did not give the jury a mechanism to give effect to the mitigating evidence

offered by the defense in the penalty phase.  *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)

("*Penry I*"); *Penry v. Johnson*, 532 U.S. 782, 797 (2001) ("*Penry II*") ("[T]he key under *Penry I* is

that the jury be able to 'consider and *give effect to* [a defendant's mitigating] evidence in imposing

sentence.'") (alteration in original).

Regarding the mitigating evidence, the instructions provided:  "[Y]ou may consider in

answering the special issues, facts and circumstances, if any, presented in evidence in aggravation,

extenuation or mitigation thereof."  These instructions direct the effect of any mitigation evidence

---

[12] Summers also referenced a series of claims brought before the district court with respect to his sentence of death.  However, Summers only briefed the solitary issue of whether or not the jury instructions allowed the jury to give effect to evidence presented in mitigation during the penalty phase of his trial.  Summers abandoned his other claims by failing to brief them.  *See, e.g., Yohey v. Collins*, 985 F.2d 222, 224–25 (5th Cir. 1993) (holding that appellant who sought to incorporate previously filed arguments by reference "has abandoned these arguments by failing to argue them in the body of his brief").  Appellants are required under Rule 28(a)(4) of the Federal Rules of Appellate Procedure to include "the reasons he deserves the requested relief with citation to the authorities, statutes and parts of the record relied on."  *Weaver v. Puckett*, 896 F.2d 126, 128 (5th Cir. 1990) (internal citations and quotations omitted); Fed. R. App. P. 28(a)(4)(B).  *See also Hughes*, 412 F.3d at 597; *Lookingbill*, 293 F.3d at 263 & n.11.

back into the special issues deliberations.[13]  As a result, the constitutionality of these jury instructions may be det ermined by answering the question of whether or not the special issues provided the jury with a vehicle to consider and give effect to Summers's mitigating evidence.  *See Penry II*, 532 U.S. at 797.  If the special issues fail to adequately encompass the mitigating evidence, the instructions are unconstitutional.  *Id.*

Summers did not present the type of evidence that gave rise to the *Penry* cases (child abuse and mental retardation), *Tennard v. Dretke*, 542 U.S. 274, 277 (2004) (low IQ), or *Smith v. Texas*, 543 U.S. 37, —, 125 S. Ct. 400, 403 (2004) (low IQ and parental issues).  Unlike the evidence in these cases, which could not be given effect under the special issues, the evidence Summers presented during the penalty phase was self-styled as "evidence of good character and good conduct."  Summers's evidence in mitigation included testimony describing, *inter alia*, his nonviolent nature and general good character, his grief for his parents' death, and his ability to conform to prison life.

The district court denied Summers's claim citing both *Boyd v. Johnson*, 167 F.3d 907, 912 (5th Cir. 1999), and *Barnard v. Collins*, 958 F.2d 634, 640 (5th Cir. 1992), for the proposition that, in this circuit, the special issues do allow the jury to consider and give effect to mitigating evidence of a defendant's good character.  Summers's contention is plain:  he asserts that those cases were overruled by both *Penry II* and *Smith*.  However, since the Supreme Court handed down *Penry II* and *Smith*, our circuit has continued to look to *Boyd* and *Barnard* as support for the holding that we

---

[13] Because these instructions do not require the jury to change otherwise "yes" answers to "no," they are not nullification instructions as that term is used.  As a result, they do not give rise to the additional issues relating to nullification instructions discussed in *Penry II*, 532 U.S. at 798–804.

rely on here.  In *Coble v. Dretke*, we held:

> "Evidence of good character tends to show that the crime was an aberration, which may support a negative answer to the special issue regarding the future dangerousness of the defendant."  Therefore, as this court has previously held, "[go od character] evidence can find adequate expression under [the] second special issue."

417 F.3d at 525 (quoting both *Boyd*, 167 F.3d at 912, and *Barnard*, 958 F.2d at 640, post-*Smith* and

post-*Penry II*) (internal citations omitted) (alterations in original).  *See also Newton v. Dretke*, 371

F.3d 250, 256-57 (5th Cir. 2004) (holding that mitigating evidence relating to good character may

be adequately considered under the special issues post-*Penry II*) (citing cases).  To the extent that

they hold that the Texas special issues allow juries to consider and give effect to mitigating evidence

of good character, *Boyd* and *Barnard* remain sound.  Indeed, the Supreme Court's analysis of this

issue compels our present jurisprudence:

> [W]e are not convinced that *Penry* could be extended to cover the sorts of mitigating evidence [Petitioner] suggests without a wholesale abandonment of *Jurek* and perhaps also of *Franklin v. Lynaugh*[,487 U.S. 164 (1988) (plurality opinion)].  As we have noted, *Jurek* is reasonably read as holding that the circumstance of youth is given constitutionally adequate consideration in deciding the special issues. We see no reason to regard the circumstances of [Petitioner]'s family background and positive character traits in a different light. [Petitioner]'s evidence of transient upbringing and otherwise nonviolent character more closely resembles Jurek's evidence of age, employment history, and familial ties than it does Penry's evidence of mental retardation and harsh physical abuse.  As the dissent in *Franklin* made clear, virtually any mitigating evidence is capable of being viewed as having some bearing on the defendant's "moral culpability" apart from its relevance to the particular concerns embodied in the Texas special issues.  It seems to us, however, that reading *Penry* as petitioner urges—and thereby holding that a defendant is entitled to special instructions whenever he can offer mitigating evidence that has some arguable relevance beyond the special issues—would be to require in all cases that a fourth "special issue" be put to the jury: "'Does any mitigating evidence before you, whether or not relevant to the above [three] questions, lead you to

> believe that the death penalty should not be imposed?'" The *Franklin* plurality rejected precisely this contention, finding it irreconcilable with the Court's holding in *Jurek*, and we affirm that conclusion today.

*Graham v. Collins*, 506 U.S. 461, 476-77 (1993) (internal citations omitted).

Summers only contends that his evidence of good character could not be considered and given effect under the jury instructions used in his penalty phase. His position is foreclosed under our precedent in both *Boyd* and *Barnard*, which remain sound, and *Coble*, which relies on those cases. In light of this authority, habeas relief is denied.

## IV. CONCLUSION

For the reasons stated above, the application for additional COAs is DENIED and the district court's denial of habeas relief is AFFIRMED.